RECORD No. 23-1581

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**WARREN BALOGH**,
*Plaintiff-Appellant,*

**AND**

**GREGORY CONTE**,
*Plaintiff,*

v.

**COMMONWEALTH OF VIRGINIA; TERRENCE R. MCAULIFFE; VIRGINIA STATE POLICE; STEVEN FLAHERTY; BECKY CRANNIS-CURL; BRIAN JOSEPH MORAN; CITY OF CHARLOTTESVILLE; MICHAEL SIGNER; WES BELLAMY; CHARLOTTESVILLE POLICE DEPT; AL THOMAS, JR.; EDWARD GORCENSKI; SETH WISPELWRY; DEWAYNE DIXON; DARYL LAMONT JENKINS; LACEY MACAULEY,**
*Defendants-Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT CHARLOTTESVILLE**

### OPENING BRIEF OF APPELLANT – BALOGH

**Glen K. Allen**
**GLEN K. ALLEN LAW**
**5423 Springlake Way**
**Baltimore, Maryland 21212**
**Phone: (410) 802-6453**
glen@glenallenlaw.com

**Counsel for Warren Balogh**

**Frederick C. Kelly, III**
**Law Office of Frederick C. Kelly**
**One Harriman Square**
**Monroe, NY 10950**
**Phone: (845) 294-7945**
fckellylaw@protonmail.com

**Counsel for Warren Balogh**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ............................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES ................................................................. 2

STATEMENT OF THE CASE ............................................................. 3

    Judge Conrad's Injunction Against the City of Charlottesville's Attempt to Revoke the Unite the Right Permit ............................................................................. 4

    Balogh's Pro Se Complaint ......................................................... 5

    Defendants' Motions to Dismiss and Balogh's Motion for Recusal ............................................................................. 6

    The Heaphy Report ................................................................ 7

    Order Staying Case ................................................................ 25

    Judge Moon's Order and Memorandum Opinion Dismissing Case ............................................................................ 25

SUMMARY OF ARGUMENTS ........................................................ 26

ARGUMENT ................................................................................ 30

    I.    STANDARD OF REVIEW ................................................. 30

    II.    NEITHER *KESSLER V. CITY OF CHARLOTTESVILLE, ET AL.*, No. 20-1704 (4th Cir. Dec. 29, 2022) NOR *TURNER V. THOMAS*, 930 F.3d 640 (4th Cir. 2019) IS DISPOSITIVE OF THIS APPEAL. ............................................................... 31

    III.    THE GOVERNMENT MAY NOT RELY ON ANTIFA HOSTILITY AS AN EXCUSE NOT TO PROTECT BALOGH'S EXERCISE OF HIS

FUNDAMENTAL FIRST AMENDMENT RIGHTS.............................................................................33

IV.    DEFENDANTS / APPELLEES THOMAS AND CRANNIS-CURL ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW ON A MOTION TO DISMISS, WHERE BALOGH'S COMPLAINT, ESPECIALLY IN LIGHT OF THE HEAPHY REPORT, PLAUSIBLY ALLEGED THAT THEY DISREGARDED ESTABLISHED LAW IN NOT PROTECTING BALOGH...........................................................43

V.    THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S *MONELL* CLAIM AGAINST THE CITY OF CHARLOTTESVILLE. ...................................46

VI.    THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S EQUAL PROTECTION CLAIM. ............................47

VII.    THE HECKLERS' VETO DOCTRINE IS DIRECTLY RELEVANT TO KEY ISSUES IN THIS CASE. ............................................................49

CONCLUSION ....................................................................51

REQUEST FOR ORAL ARGUMENT ...................................51

CERTIFICATE OF COMPLIANCE ....................................53

# TABLE OF AUTHORITIES

## Cases

*Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985)....................................................54

*Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 233 (6th Cir. 2015)..............3, 30, 49

*Booker v. S.C. Dept of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017)............................48

*Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984)....................................33

*Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940)..........................................29, 49

*City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988) .............................................52

*Conte and Balogh v. Commonwealth of Virginia, et al.*, 2023 WL 3121220 (W.D. Va. Apr. 27, 2023) ......................................................................26

*Cooper v. Aaron*, 358 U.S. 1, 16 (1958).................................................................36

*Cox v. Louisiana,* 379 U.S. 536, 551 (1965) .....................................................36, 49

*Crowder v. Sinyard*, 884 F.2d 804 (5th Cir. 1989)..................................................52

*DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989)..................................................................................................44

*Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015)........................................................44, 45

*Edwards v. South Carolina*, 372 U.S. 229, 237 (1963) .....................................36, 49

*Feiner v. New York*, 340 U.S. 315 (1951)..........................................................30, 50

*Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123 (1992) ....................32, 56

*Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) ........................................................................................................................33

*Gregory v. City of Chi.*, 394 U.S. 111 (1969)..........................................................49

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 516 (1939)..............................29, 49

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .............................................................50

*Heckler's Veto Case Law as a Resource for Democratic Discourse,* 35 Hofstra L. Rev. 1305 (2007) ................................................................55

*Houck v. Substitute Trustee Services, Inc.,* 791 F.3d 473, 484 (4th Cir. 2015) ................................................................................................33

*Kessler v. City of Charlottesville, et al.*, 441 F.Supp.3d 277 (W.D. Va. 2020) ...........................................................................................passim

*Kessler v. City of Charlottesville, et al.,* No. 20-1704, 2022 WL 17985704 (4th Cir. Dec. 29, 2022) ............................................2, 28, 34

*Kessler v. City of Charlottesville*, No. 3:17-CV-0056, 2017 WL 3474071 (W.D. Va. Aug. 11, 2017)..................................................4, 5, 6

*New Century Foundation v. Robertson,* 400 F.Supp.3d 684 (M.D. Tenn. 2019) ............................................................................................56

*Nieves v. Bartlett*, 587 U.S. -- , 139 S.Ct 1715, 1725 (2019) ...................48

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009)......................................29

*Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) .............................44, 45

*Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4[th] 573, 597 (4th Cir. 2023) ..................................................................................................4

*Schenck v. United States*, 249 U. S. 47, 52 (1919) ..................................46

*Sines v. Kessler,* 324 F.Supp.3d 765 (W.D. Va. 2018)...............................8

*Snyder v. Phelps*, 562 U.S. 443, 458 (2011).......................................3, 34

*Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 252 (D.C. Cir. 2021) ................................................................................................37

*Terminiello v. City of Chicago*, 337 U.S. 1  (1949)............................36, 49

*Turner v. Thomas,*  930 F.3d 646 (4th Cir. 2019)...........................2, 28, 34

*United States v. Kokinda*, 866 F.2d 699 (4th Cir.1989) ..............30, 49, 50

*Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) ........................36, 49

*Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) ...............................32

**Statutes**

18 U.S.C. § 1962 ............................................................................7

42 U.S.C. § 1983 ............................................................................7

Code of Virginia, §18.2-406 .................................................. 10, 37, 41

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1367. The District Court issued a memorandum opinion, Joint Appendix ("JA") at 322, and final order, JA at 337, on April 27, 2023, dismissing all of Balogh's claims. Balogh filed a timely notice of appeal on May 26, 2023 (JA at 338). This Court has appellate jurisdiction under 12 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether *Kessler v. City of Charlottesville, et al.,* No. 20-1704, 2022 WL 17985704 (4th Cir. Dec. 29, 2022) (hereafter "*Kessler Appellate Decision*") and *Turner v. Thomas,* 930 F.3d 646 (4th Cir. 2019) are dispositive of this appeal, where the *Kessler Appellate Decision* was a one-page unpublished opinion entitled to no precedential value and no First Amendment issues were raised in *Turner*?

2.    Whether the Defendants / Appellees can rely on Antifa hostility and violence as an excuse not to protect Appellant Balogh's exercise of fundamental First Amendment rights?

3.    Whether Defendants / Appellees Police Chief Thomas and Lieutenant Crannis-Curl were entitled to qualified immunity as a matter of law on a motion to dismiss, where the complaint, especially in light of the Heaphy Report incorporated into the complaint, plausibly alleged that Defendants / Appellees disregarded established law in not protecting Balogh under the circumstances of this case?

4.    Whether the District Court erred in dismissing Balogh's *Monell* claim against the City of Charlottesville?

5.    Whether the District Court erred in dismissing Balogh's Equal Protection claim?

6.    Whether the Hecklers' Veto Doctrine is relevant to key issues in this appeal?

## STATEMENT OF THE CASE

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 233 (6th Cir. 2015) (quoting *Snyder v. Phelps*, 562 U.S. 443, 458 (2011)). In the Western District of Virginia, however, and even here in the Fourth Circuit, this principle remains an unfulfilled promise, at least where the Dissident Right is concerned. Here, the City of Charlottesville and its officials have yet to be held accountable for leaguing themselves with Antifa rioters wielding "soda cans filed with cement," Heaphy Report ("HR") at JA205, JA259, JA262,[1] who had come "to fight, to disrupt, and even to throw urine and feces" precisely because, like the Appellees in power in Charlottesville, they found the Dissident Right's ideas offensive or disturbing. HR at JA195, 259, 262. If this Court is not following the new "'bad man' theory of the law" identified by Judge Richardson in his recent dissent in *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 597 (4th Cir. 2023), this miscarriage must end now.

---

[1] The Heaphy Report is contained in the Joint Appendix at JA095 to JA314.

3

### Judge Conrad's Injunction Against the City of Charlottesville's Attempt to Revoke the Unite the Right Permit

The relevant background to this case begins with Jason Kessler's application on May 30, 2017 for a permit to conduct a demonstration – the Unite the Right ("UTR") Rally – In Emancipation Park, formerly Lee Park, in the City of Charlottesville on August 12, 2017. *See Kessler v. City of Charlottesville*, No. 3:17-CV-0056, 2017 WL 3474071 (W.D. Va. Aug. 11, 2017) (hereafter "*Kessler Injunction Opinion*" or "*Kessler Injunction Case*"). On June 13, 2017, the City granted the request. On August 7, 2017, however, less than a week before the long-planned demonstration, the City revoked the permit, advising Kessler that it was "modify[ing]" it based on "safety concerns" to require the demonstration to take place at McIntyre Park, more than a mile from Lee / Emancipation Park[2]. *Kessler Injunction Opinion*, 2017 WL 3474071 at * 2-3. At the same time, however, the City took no action to modify or revoke the permits it had issued to counter-protestors for demonstrations planned within blocks of Emancipation Park. *Id*.

Kessler then sought an injunction to prevent the City's revocation and modification of his permit. In opposing Kessler's complaint for injunctive relief, the City characterized the proposed UTR rally as "the largest hate gathering of its

---

[2] The Heaphy Report refers to the park interchangeably as "Lee Park" and "Emancipation Park" and this brief will follow that example.

kind in decades," quoting from the Southern Poverty Law Center, an avowed ideological enemy of Kessler and the UTR participants. *See Kessler Injunction Case,* No. 3:17 – cv—56 (W.D. Va. Aug. 11, 2017), Docket Entry 10 (Defendants' Brief In Opposition to Plaintiff's Motion for Preliminary Injunction) at 3 (available on PACER). In granting the injunction, Judge Conrad stated:

> [T]he court concludes that Kessler has shown that he will likely prove that the decision to revoke his permit was based on the content of his speech. Kessler's assertion in this regard is supported by the fact that the City solely revoked his permit, but left in place the permits issued to counter-protestors. The disparity in treatment between the two groups with opposing views suggests that the defendants' decision to revoke Kessler's permit was based on the content of his speech rather than other neutral factors that would be equally applicable to Kessler and those protesting against him. This conclusion is bolstered by other evidence, including communications on social media indicating that members of City Council oppose Kessler's political viewpoint. At this stage of the proceedings, the evidence cited by Kessler supports the conclusion that the City's decision constitutes a content-based restriction of speech.

*Kessler Injunction Opinion*, 2017 WL 3474071 at * 2-3.

### Balogh's Pro Se Complaint

In accordance with Judge Conrad's injunction, the UTR rally began on August 12, 2017. The tumultuous events that followed were described, together with relevant background, in Balogh's pro se complaint, which he filed on August 12, 2019. JA013. Balogh's complaint was initially filed in the Eastern District of

Virginia, but was transferred to the Western District, Judge Moon presiding, on July 9, 2020. Docket Entry ("DE") 48.

In his complaint, Balogh alleged that the defendants, motivated by hostility to the UTR protestors and indifferent to the First Amendment, created a situation that denied Balogh's freedom speech and even led to his assault. Balogh alleged six claims, four under 42 U.S.C. § 1983 and two under 18 U.S.C. § 1962 (RICO) against 16 defendants. Five defendants were never served. The eleven who were served included The City of Charlottesville, Al Thomas, Jr. (Chief of Police of the City of Charlottesville at the time of the events alleged in the complaint, named in his individual and official capacities), and Becky Crannis-Curl (a Lieutenant in the Virginia State Police at the time of the events, named in her individual capacity). The concrete allegations in Balogh's complaint and in the Heaphy Report supporting Balogh's claims will be discussed with particularity later in this brief.

### Defendants' Motions to Dismiss and Balogh's Motion for Recusal

All eleven defendants moved to dismiss. On March 17, 2021, Balogh requested that Judge Moon recuse himself from the case. DE 58. The basis for the motion was that two of Judge Moon's law clerks were revealed to be close personal friends with a plaintiff, Elizabeth Sines, in the *Sines v. Kessler,* 324 F.Supp.3d 765 (W.D. Va. 2018) case, which involved civil claims against numerous pro-monument protestors in the UTR rally. This relationship, which was discovered by Jason

Kessler in the *Kessler v. City of Charlottesville, et al.*, 441 F.Supp.3d 277 (W.D. Va. 2020) case (hereafter "*Kessler District Court Decision*" or "*Kessler District Court Case*") and had not been disclosed by Judge Moon, was shown in a photograph and caption reading "Best of Friends" on the public Facebook account of one of the law clerks. JA050-051 (referencing pleading filed in *Kessler District Court Decision*). Moreover, in a law.virginia.edu new article Ms. Sines identified the other law clerk as a person she spoke to immediately following her alleged involvement in the UTR event. *Id*.

On January 11, 2021, Judge Moon held a hearing on defendants' motions to dismiss and Balogh's motion to recuse. DE 59; JA055. Judge Moon began the hearing by denying Balogh's motion to recuse. JA060. Thereafter, the defendants requested that the Heaphy Report, which had been repeatedly referenced in Balogh's complaint, be deemed incorporated into the complaint. JA063-064. Balogh and his co-plaintiff agreed, and Judge Moon ruled that the Heaphy Report was so incorporated, thus becoming a source of concrete factual allegations supporting the plausibility of Balogh's claims. Judge Moon had previously deemed the Heaphy Report incorporated into Kessler's complaint in the *Kessler District Court Decision*.

### The Heaphy Report

Although Balogh's complaint is fully adequate by itself under *Twombley* standards to state claims and therefore require reversal of Judge Moon's dismissal,

this conclusion is bolstered by the Heaphy Report. Key aspects of the Heaphy Report will be summarized here; other relevant aspects will be incorporated into Balogh's arguments.

The Heaphy Report makes clear that Market Street, just south of Emancipation / Lee Park, would prove to be ground zero for the violence at the UTR rally. HR at JA239. It makes clear also that this violence was perfectly foreseeable; indeed, superiors in the Charlottesville Police Department ("CPD") "expected things to go south" all along. *Id.* Well before Chief Thomas was heard to say (apparently sometime around 11 o'clock on the morning of August 12, 2017 as violence was unfolding), "Let them fight, it will make it easier to declare an unlawful assembly" (HR at JA108), the pre-determined plan by Appellees already was "to declare the event unlawful and disperse the crowd." HR at JA205.

But to declare an unlawful assembly under Virginias law there must first be "the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order." Code of Virginia, §18.2-406. Appellees' plan, then, depended on the occurrence of unlawful acts of force and violence. Thus, the violence that occurred at the UTR rally was not a "bug" (the result of extremely poor planning) but an intended "feature" of that planning, as shown below.

It is undisputed that the CPD settled on a plan of forcing the UTR attendees to enter Lee Park through entrances on Market Street, which accessed the park from

the south. HR at JA203. The CPD knew that the UTR attendees, like Balogh, would be forced to run a gauntlet of Antifa, whose malicious intentions were well known. Having set the conditions for violence on the way in through Market Street, the various police forces then doubled down on their errors and cleared the park of UTR attendees by forcing them out onto Market Street once again – into the waiting maw of Antifa rioters. Boneheaded ineptitude may be one explanation for this plan, but it is not the only one, certainly not on review of a Rule 12 motion. Another, more plausible explanation is that the Appellees intended the violence to occur. This explanation gains strength the more one examines the facts in the record, rather than the media reports mindlessly repeated in the national press over the last several years, which reports appear to have captured the minds of both Judge Moon and the Fourth Circuit on past occasions.

On August 11, 2017, one day ahead of the planned UTR rally, representatives from the CPD met with representatives from the UTR rally to show them precisely where they would be forced to access the park on Market Street. HR at JA203. One Sergeant Newberry of the CPD, who had met with the UTR attendees on August 11th, told his supervisors that they needed to consider posting law enforcement officers on Market Street because the area would prove to be a hot spot as soon as the "counter-protestors" (viz. the Antifa) learned where the UTR rally attendees were entering the park.

Sergeant Newberry was not the only one who zeroed in on the need for a strong police presence at Market Street. The Charlottesville Fire Department had also realized that Market Street was likely to devolve into a war zone with the arrival of the Antifa. That city agency had "frequent interaction with [the CPD] and [the] larger conglomeration of agencies involved in the overall planning process." HR at JA211. The Fire Department's plan highlighted Market Street "in red and white stripes and emphasized the area with arrows." *Id.* The Heaphy Report states:

> When we asked Deputy Chief Rogers why he had labeled [Market Street] in that manner, he replied that he had major concerns with the area, both because he felt it was too close to the Command Center and *because he predicted demonstrators and counter-protesters would clash there.* The red labeling on CFD's plan was to indicate that he would not stage any CFD or EMS personnel or respond to complaints in that area given the safety concerns. Instead, [Charlottesville PD] would be required to extract injured individuals from that zone and deliver them to an extraction team nearby for treatment. Rogers expressed this opinion to [Charlottesville PD].

HR at JA211 (emphasis added).

But in the event, no police were committed to Market Street in the "open areas in which protesters and counter-protesters would interact." HR at JA203. Instead of providing police to enforce the law in the open areas where the Alt Right and Antifa "counter-protesters" would meet, Appellees settled on a much smaller contingent of police who were stationed behind barricades with orders to effectively do nothing

but watch the mayhem that would inevitably unfold. HR at JA200-201, JA203, JA237. This decision to refuse to commit the police to enforcing the law on Market Street becomes ever more peculiar the more one delves into the City's own Healy Report on the UTR debacle.

For example, leaving Market Street lawless was not always the plan. Early versions of the CPD's plan "assigned officers to areas inside and outside of [Lee Park] and along likely routes of ingress and egress. In one version, planners considered assigning as many as thirty officers to Market Street south of [Lee] Park and twenty officers along 1st and 2nd Streets north of the park." HR at JA199, JA200. Yet that plan was scrapped. When questioned as to such an obvious blunder, "no one on the CPD command staff could provide a specific answer." HR at JA200.

Once the permit for the UTR rally was filed on May 30, 2017, the Appellee CPD, headed by Appellee Chief Thomas, appears to have immediately begun "intelligence gathering efforts" on what to expect for that event. HR at JA176, JA177. The intelligence reports were completed prior to July 8, 2017 (but would continue to be updated prior to the rally on August 12, 2017). HR at JA177. Appellee City's own post mortem Heaphy Report stated that the intelligence reports would prove to be "thorough" and "accurate." HR at JA259.

The intelligence reports showed that UTR protestors would be significantly outnumbered by Antifa counter-protesters, perhaps as much as two to one. HR at

JA177.  Furthermore, at least some of the groups associated with the Alt Right, such as the Traditionalist Worker Party, would "not likely cause problems" – but the groups who opposed them could. The Anti-Defamation League (no friend to the Alt Right) added to this assessment, noting that it would not be the Alt Right, but rather the counter-protestors (i.e., Antifa), who would present "extremely boisterous counter-protest from militant anti-fascist groups." *Id*. The FBI's Richmond field office warned Appellees that Antifa "would attempt to disrupt the [UTR rally] using soda cans filled with cement and balloons or water bottles filled with paint, urine, or fuel." *Id*. Cement filled cans appear to be a favored tactic of the Antifa, for in the "week before August 12, the Virginia Fusion Center shared credible threats that members of Antifa would bring soda cans filled with cement and might attack police." HR at JA205. The acknowledged possibility for violence at the UTR rally was widespread, with "multiple officers involved in the investigations unit" imploring "the command staff [of the CPD] that large-scale violence should be expected and that people would be traveling to Charlottesville 'to fight, to disrupt, and even to throw urine and feces.'" HR at JA195.

Again and again the City's own Heaphy Report indicates that the violence at the UTR rally would be started by, and come primarily from, the Antifa counter-protesters. For example, although there were murmurings of the potential for violence on August 12, state and local law enforcement explained that most of that

"noise" arose from groups that planned to come in opposition to the UTR protesters. HR at JA187. And the City Council was told – and to reiterate, the City's own Heaphy Report characterized such intelligence as "thorough" and "accurate," HR at JA259 -- that generalized threats of violence, promises to use violence in self-defense, and information that counter-protesters planned to use violence to quell a permit holder's speech were insufficient bases to move the event from [Lee] Park. HR at JA187.

Nor did Appellees need to rely on forecasts alone. By the time of the UTR rally on August 12, 2017, Appellees had the benefit (if such is the word) of actual experience with the Antifa. This came during an organized protest barely a month before the UTR rally, when a chapter of the Ku Klux Klan came to Charlottesville on July 8, 2017. Like Balogh and Unite the Right, the Klan also came to protest the renaming of the parks and the destruction of the Confederate monuments. HR at JA138-176. In that event, Appellees saw that 40 to 60 Klansmen ended up confronting a hostile crowd of "counter-protestors" numbering between 1,500 to 2,000. HR. at JA163. Among them were the Antifa.

The City's Heaphy Report had this to say about the Antifa's presence on July 8, 2017 at the Klan rally:

> Law enforcement personnel immediately noticed Antifa's sophisticated level of organization. Lieutenant Hatter observed that Antifa coordinated with local activists, had logistics and

13

> medical support, and figured out the Klan's entrance location to the park. Lieutenant O'Donnell characterized Antifa as "very organized" and "totally coordinated." He spoke with a "street medic" who revealed that she had protested at Standing Rock, South Dakota for eight months before arriving in Charlottesville. At 2:15 p.m., Antifa was spotted wearing gas masks, padded clothing, and body armor. Captain Shifflett recalled being surprised at the planning by some counter-protesters who brought organized medics, used walkie-talkies to share information, and wore helmets, full body pads, gas masks, and shields. CPD Lieutenant Dwayne Jones observed counter-protesters actively monitoring scanners and other devices to track the movements and communications of the police.

HR at JA158.

Predictably, there was violence at the Klan rally on July 8, 2017 – but it did not come from the Klan. It came from Appellees' allies who opposed the Klan. HR at JA160. Indeed, it was necessary for the CPD to form a human wall to escort the Klan through the crowd of protestors. HR at JA161. Even so, "the counter-protesters gathered on both sides of the human police wall threw punches, launched bottles and fruit, and shouted ugly chants at the Klan." *Id.*

The Klan stayed only about 35 minutes and left in relative peace, peace which was unmistakably due to the heavy police escort. HR at JA162, 164-165. It was at that point that the counter-protestors turned, in earnest, on the police. One Lieutenant Durrette later observed that "as we escorted the KKK from the rally to the garage, we encountered people that threw tomatoes, water bottles, and some officers were

spit on." HR at JA164. A former Mayor of Charlottesville observed that "after the Klan left, counter-protesters turned on law enforcement and things got crazy." HR at JA165. One episode even saw the partisans of tolerance swarming the Charlottesville SWAT team's armored Bearcat vehicle, a brazen act of aggression which necessitated back up from the Virginia State Police SWAT team to clear the way. HR at JA165-66. A female counter-protestor assaulted a police officer by kicking him in the groin (HR at JA016); and when Charlottesville Deputy Fire Chief Emily Pelliccia "questioned one of the street medics, she was spat upon and informed that they travel with Antifa for Antifa's protection." HR at JA167. Infantile slogans such as "Cops and Klan go hand in hand" were bantered about while the above occurred. HR at JA165.

The counter-protestors resisted repeated calls to disperse after the Klan had gone. HR at JA165-168. Ultimately, on July 8, 2017, the CPD issued not one, not two, but three "unlawful assembly" declarations and resorted to gassing the partisans of tolerance to get them to behave. *Id.* Apparently, it was only the tear gas that finally convinced the counter-protestors to go home. HR at JA168. Twenty-two people ended up being arrested that day. HR at JA169.

What did the counter-protestors want on July 8, 2017? From the City's own Heaphy Report:

> An anonymous eyewitness felt that the police went out of their way to protect the Klan. She told us that the police presence

15

> was so strong that "even if I wanted to jump the barricades and
> attack the KKK I could not." She felt that the police protected
> the Klan more than counter-protesters. Ann Marie Smith
> suggested that the positioning of the police between the
> barricades was "unsettling" because the police faced the counter-
> protesters with their backs to the Klan, giving the crowd the
> impression that the police were protecting the Klan while
> suspicious of the crowd.

HR at JA163.

The above gives some indication of what Appellees expected Balogh and

others like him to confront without the benefit of effective law enforcement on

Market Street during the UTR rally. Notably, Chief Thomas and the CPD faced

immediate criticism for the use of tear gas and the amount of force used against the

Antifa and other counter-protestors at the Klan rally. HR at JA169. The Mayor of

Charlottesville even requested that Chief Thomas appear before the City Council to

explain the use of tear gas, which request Thomas later declined. HR at JA170.

The City's Heaphy Report confirms that protecting the First Amendment

rights of the 40 to 60 Klansmen against the thousands of counter-protestors on July

8, 2017, cost Chief Thomas, the police, and the City of Charlottesville the goodwill

of many of Charlottesville's progressive partisans. For example, Reverend Seth

Wispelwey explained that community progressives and faith leaders had an

extremely strong reaction to the tear gas after July 8. To many, "it seemed like [the

police] had no plan, other than protecting white supremacy."  HR at JA170.

Wispelwey worried that City leaders and law enforcement "didn't know what they were doing." *Id*. The image of police focusing  on protecting the Klan and acting aggressively toward the counter-protesters angered others in the community. Ann Marie Smith was disappointed by the lack of explanation of tear gas use by CPD. Like many others, she came away from the event with less trust in police. Assistant City Manager Mike Murphy observed that the crowd's angry mood was exacerbated by the Virginia State Police's riot gear and presence of Bearcat armored vehicles. *Id*.

It is in the context of that criticism, and the Appellee City's own ideological commitments, that the failures of Appellees during the UTR rally should be construed, especially on review of a Rule 12 motion. One of the successes of the Klan rally (and subsequent Antifa riot) on July 8, 2017 lay in protecting the First Amendment by keeping the Klan separated from the thousands of counter-protestors intent on suppressing their speech by violence against them. This was accomplished by police escort of the Klan into Justice (formerly Jackson) Park. As one officer remarked in the Heaphy Report (regarding the escort by the police from the park to a nearby garage), "'thank [G]od we parked them in the garage, otherwise we probably would have had to shoot someone' to get the Klan out later." HR at JA161. But in the wake of that success at the Klan rally, Chief Thomas strangely settled on

a policy of refusing to escort the UTR speakers into their rally. "I'm not going to get them in and out," Chief Thomas declared. HR at JA204.

The CPD had also, quite sensibly, settled on the use of barriers to keep the Klan separate from its obviously hostile audience, an audience that dwarfed the licensed speakers in both size and intensity. HR at JA144. The Charlottesville Parks and Recreation Department ("CPRD") was tasked with setting up the barriers around the Klan rally on July 8, 2017. As the CPRD Director later stated, the CPD plan in this respect was "well thought out," and attempting to keep the protesters separate from the counter-protesters "made a ton of sense." *Id*. For the Klan rally on July 8, 2017, "[t]he final Operational Plan segregated Justice Park into five zones with the goal of separating the Klan and counter-protesters at all times." HR at JA150.

But no such attempt was made at the UTR rally just a few weeks later. Instead, to the apparent surprise of lower-level police officers and the Charlottesville Fire Department (HR at JA203, JA211), Appellees took steps to ensure that the hostile crowds mixed, especially on Market Street. The only barriers that would be used were to separate the police from the open areas around Lee Park (such as Market Street), where the Alt Right would be ambushed by the much larger Antifa crowd. HR at JA201, JA203.

For the Klan rally, the CPD had also settled on enforcing the law early and often: "Major Pleasants recalled that CPD officers were told to 'set the tone early'

18

by making arrests. Captain Lewis remembered that the CPD instructions were to arrest 'early and often' and that VSP was also very clear about its intent to arrest disruptive counter-protesters." HR at JA155.

But again, in the wake of the criticism by Charlottesville's progressive citizenry, Appellees settled on the opposite tactic for the UTR rally. Although fighting was surely expected, in contrast to July 8, 2017, Appellees settled on a policy of tolerating violence. Early in the planning process, the Virginia State Police had discussed "'setting the tone' early in the event by making arrests and deescalating fights. But as the event grew closer, [the CPD] took the lead and the tone changed." HR at JA208. How did it change? The City's post mortem Heaphy Report recounts:

> Officer Lisa Best was assigned to Lieutenant O'Donnell's zone. She told us that officers "were not going to go in and break up fights" or enter the crowd to make arrests "unless it was something so serious that someone will get killed." Sergeant Robert Haney described the instructions he received as "do not interrupt mutual combat" unless someone is seriously injured. Lieutenant McKean commanded Zone 1. He told us that he was "not sending guys out there and getting them hurt." This concern is reflected in our review of body camera footage, which reflects multiple instances of officer uncertainty about potential engagement with the crowd.
>
> Rather than engage the crowd and prevent fights, the CPD plan was to declare the event unlawful and disperse the crowd.

HR at JA205.

Despite the vicious tactics and numbers of the Antifa, there is no evidence that "setting the tone early" by "engaging the crowd and preventing fights" would have proved futile. Indeed, it is notable that the sole documented instance of police intervention at the UTR rally was successful. HR at JA235. Around 10:30 on the morning of the UTR rally, Lieutenant Hatter (apparently the same man who had noticed Antifa's sophisticated tactics and tie in with local activists at the prior Klan rally – HR at JA158) "jumped over the barricade to deescalate the tension between the flag-toting demonstrator [a UTR attendee] and the crowd around him [which had attempted to steal his flag]." HR at JA235. Lieutenant Hatter had disregarded orders to quell the incipient violence, a fact which his fellow officers who witnessed the event noted. *Id*. The report states: "This is the only instance we identified of a CPD officer leaving a barricaded safe zone to enter the crowd and de-escalate a potentially violent situation on August 12." *Id*. But it worked.

But protecting the First Amendment rights of a dissident minority had proved unpopular in Charlottesville. This is not surprising. The local government of Charlottesville was irredeemably "woke," and it had ideological commitments that effectively allied itself with the cement-throwing Antifa.

After Donald Trump was elected, Charlottesville's Mayor – a man with the direct backing of the Charlottesville City Council (HR at JA128) – held an unscheduled rally on January 1, 2017 (one of dubious legality under the City's

20

permit regulations — HR at JA128-129, 131) in which he declared Charlottesville the "Capital of the Resistance." HR at JA131. Elsewhere in the City's own report, the Mayor is candidly acknowledged as a "like minded activist" (viz. a left-wing activist), along with Charlottesville Office of Human Rights Manager Charles Green. HR at JA135.

Then, in an act akin to the Taliban's treatment of the Bamiyan Buddha statues, the City Council voted on February 6, 2017 to remove Confederate monuments, notwithstanding the fact that at least one of the monuments "was considered to be one of the best equestrian statues in the country" and was listed on both the Virginia Landmarks Register and the National Register of Historic Places. HR at JA129, JA131. From Medieval Byzantium to the French Jacobins to today's woke partisans, iconoclasm has ever been the preserve of fanatics.

The presence of Vice Mayor Wes Bellamy on the government's rolls is another tell-tale sign: he is man with a history of anti-white racist speech on Twitter, facts which do not seem to have cost him the confidence of the Charlottesville City Council. HR at JA131. Moreover, on May 14, 2017, the two ranking executive officers of Charlottesville (City Manager Maurice Jones and Assistant City Manager Mike Murphy) had received a semi-literate email demanding "unity" to "take back Lee Park" from white nationalists who had earlier staged a rally there. This was to be accomplished with a candlelight vigil to be held that night. HR at JA135-136. The

21

email stated (among other things): "their statues WILL COME DOWN... [S]urj antifa phar apoc uva students united and living wage...all of us. [T]ogether." *Id*. (Capitals in the original). But Charlottesville's Assistant City Manager clearly welcomed the opportunity for "unity" with the Antifa in his city, remarking (at 3:02 pm on May 14, 2017, to be precise): "heard about [the event] a while ago," and that it "[s]ounds like a peaceful effort to respond to last night's event." HR at JA136.

Under FRCP 12, that email from the Assistant City Manager on May 14, 2017 is fairly linked to the City's own assessment from the Klan rally on July 8, 2017, where "Law enforcement personnel immediately noticed Antifa's sophisticated level of organization. [And]... observed that Antifa coordinated with local activists, had logistics and medical support, and figured out the Klan's entrance location to the park." HR at JA112. It plausibly suggests that the cement can throwing Antifa, who had come to fight and throw urine and feces (HR at JA195, 259, 262), the Antifa who by August 12, 2017 had a demonstrated pattern of spitting on and assaulting police officers (HR at JA166-167), and who were aggressive enough to swarm a SWAT Bearcat armored vehicle (HR at JA165-166), enjoyed ideological support at the highest levels of the Charlottesville government, and perhaps even outright coordination with the Charlottesville government through other likeminded activists. Reviewing Appellees' own ideological commitments, one is reminded of Alexander Bickel's observation, that "Words and concepts such as those of due process and

equal protection, are only words and concepts, to be sure, but they breed attitudes, they tend toward a mindset, they influence future thought and action."  Alexander Bickel, *The Morality of Consent* p. 6 (New Haven: Yale University Press – 1975). To which we might add: the mindset they breed is itself often one of fanaticism, e.g., "the police presence was so strong that 'even if I wanted to jump the barricades and attack the KKK I could not.'"  HR at JA163. Those who share the vision of the anointed tend to forget that tolerance is a two-way street.

It is plausible that Appellees' ideological commitments made it unpopular for Appellees to protect dissident speech to begin with. The "vocal community criticism" received by the City in the aftermath of the Klan rally/Antifa riot on July 8, 2017, and by the police in particular (HR at JA169, 175, 179), would have put Appellees on edge. In response to that criticism, Appellees settled on a new strategy: exploit the perfectly foreseeable Antifa violence, which, after all, had the support of strong elements within the Charlottesville community, as a means of shutting down the speech of the hated Alt Right. If the rights and even the safety of men like Balogh were sacrificed in the process, so be it.

That would explain why separating the groups, which had had some limited success on July 8, 2017, was not attempted. In fact, just the opposite, the operational plan of the CPD and Chief Thomas pushed the two rival groups together on Market Street when the Alt Right attempted to access the park. Putting an exclamation point

on their malice, Appellees then cleared the park of UTR attendees, like Balogh, by pushing them out onto Market Street once again, into the waiting arms of the people Appellees knew had come "to fight, to disrupt, and even to throw urine and feces." Lieutenant Hatter once again stands witness against Appellees –"people [were] getting hurt, and I'm standing around behind a steel fence…guarding an empty parking lot":

> [He] described the dispersal of [Lee] Park on August 12 as the "most messed up thing I ever saw." Hatter noted that the Alt-Right demonstrators were screaming at the VSP and CPD officers as the mobile field force pushed from the rear of Emancipation Park, commenting that "you are pushing us right into the crowd." Hatter agreed with this assessment, noting that the effort was "causing confrontations and pushing [the Alt-Right] right into their enemies." Lieutenant Mooney similarly told us that several of the Alt-Right demonstrators complained to him that the dispersal order "is pushing us right into our enemies."

HR at JA242.

Lieutenant Hatter was not alone. Fellow Lieutenant Jim Mooney stated: "We were sitting there with our thumbs up our asses." *Id*. The Hobessian war of all against all would answer Appellees needs perfectly; and if the Alt Right fought back defensively, all the better, for it would perhaps give an erring judge the opportunity to quickly declare "a pox on both their houses" and quickly move on.

24

**Order Staying Case**

On March 17, 2021, Judge Moon, finding that many of the issues in the *Kessler District Court Case*, which had been appealed to the Fourth Circuit, were substantially similar to the issues before the Court in the *Balogh* case, stayed *Balogh* until 15 days after the Fourth Circuit's decision in *Kessler*. DE 61; JA315.

**Judge Moon's Order and Memorandum Opinion Dismissing Case**

On April 27, 2023, following the Fourth Circuit's unpublished *Kessler Appellate Decision*, Judge Moon issued his order and memorandum opinion dismissing Balogh's complaint in its entirety. Documents 69 and 70; JA322-323; *Conte and Balogh v. Commonwealth of Virginia, et al.*, 2023 WL 3121220 (W.D. Va. Apr. 27, 2023). In his opinion, Judge Moon dismissed the Commonwealth of Virginia and the Virginia State Police on Eleventh Amendment sovereign immunity grounds; dismissed the Charlottesville Police Department on grounds it is not a legal entity; dismissed the seven individual defendants on grounds of qualified immunity; dismissed the City of Charlottesville on grounds of lack of *Monell* liability; and held that Balogh's complaint failed adequately to plead Equal Protection, Hecker's Veto Doctrine, and RICO claims. Based on Balogh's present complaint, he does not contest in this appeal the dismissal of the two Virginia entities, the Charlottesville Police Department, or the RICO claims; nor the qualified immunity grounds except

as to appellees Thomas and Crannis-Curl. He does contest all other aspects of Judge Moon's dismissal order and opinion.

## SUMMARY OF ARGUMENTS

1.      The Charlottesville UTR events have become and will long remain a dramatic symbol of the political currents that divide our country. Appellant Balogh's complaint, supplemented by the incorporated Heaphy Report, presented well-supported allegations that he was denied his fundamental First Amendment rights to attend the UTR rally and physically injured by the concerted actions of the Appellees and the counter-protestors. First Amendment issues of this magnitude in such an iconic case should not be resolved, as Appellees will undoubtedly contend, based on a one-page unpublished per curiam opinion (*Kessler v. City of Charlottesville, et al.,* No. 20-1704, 2022 WL 17985704 (4th Cir. Dec. 29, 2022)) and an opinion (*Turner v. Thomas,* 930 F.3d 646 (4th Cir. 2019) that raised no First Amendment issues at all.

2.      The Heaphy Report, incorporated by reference into Balogh's complaint, provides a wealth of detail regarding the UTR events. When closely examined, the Heaphy Report, together with Judge Conrad's findings in the injunction case leading up to the UTR rally, reveals that animus and a lack of required viewpoint neutrality was a plausible explanation – indeed the most plausible explanation – for the Appellees' relevant conduct toward Balogh and the

other pro-monument demonstrators. Prominent among these facts were the City of Charlottesville's attempts to revoke Kessler's permit for the UTR rally for purported "safety reasons" while not revoking the permit of Antifa and other counter protestors; the City's refusal to use crowd control measures at the UTR rally that had been successfully deployed at the Klan demonstration a month before to avoid violence and confrontations; and the City's turning a blind eye to Antifa and other counter-protesters' violent tactics and history and deliberately pushing the UTR demonstrators directly into confrontation with Antifa and other counter-protestors.

3.    Two questions are relevant to qualified immunity: "(1) Has the plaintiff alleged a violation of a federal right? [And] (2) Was the right at issue clearly established at the time of the alleged violation?"  *Turner*, 930 F.3d at 644 (*quoting Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here both questions, unlike in *Turner*, must be answered in the affirmative.

Contrary to Judge Moon, the right to some level of police protection was clearly established. Both a published opinion of this Court and a robust consensus of persuasive authority would have told Chief Thomas and Lt. Crannis-Curl that ordering the police to sit on their thumbs behind barricades when people come to fight and throw cement cans and feces to disrupt a speaking event was wrongful

27

conduct. A robust consensus of authority exists in *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 516 (1939); *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940); and many other cases. As the Sixth Circuit noted, this body of binding precedent means that police officers cannot "sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule." *Bible Believers v. Wayne Cnty.*, 805 F.3d at 253. Instead, "the police must first make bona fide efforts to protect the speaker from the crowd's hostility." *Id.* at 255.

In *United States v. Kokinda*, 866 F.2d 699 (4th Cir.1989), *rev'd on other grounds*, 497 U.S. 720 (1990), this Court drew the same lesson. The Fourth Circuit approvingly quoted Justice Black's dissent in *Feiner v. New York*, 340 U.S. 315 (1951): "[I]f, in the name of preserving order, [the police] ever can interfere with a lawful public speaker, they first must make all reasonable efforts to protect him." *United States v. Kokinda*, 866 F.2d at 705 (*quoting Feiner,* 340 U.S. at 326-27 (J. Black, dissenting).

4.    The District Court's dismissal of Balogh's *Monell* claim against the City of Charlottesville rests on the court's assertion that City Manager Jones and not Police Chief Thomas was the relevant final policy maker. The Heaphy Report, however, reveals that the City Manager and Chief Thomas repeatedly conferred and coordinated decisions with regard to the City of Charlottesville's response to the

UTR unrest, including the events that injured Balogh. Whether this is viewed as a delegation by the City Manager, his ratification of Chief Thomas's decisions, or Thomas executing the City Manager's directives, Balogh's allegations are more than ample to satisfy the *Twombly* plausibility standard on a motion to dismiss as to Balogh's *Monell* claim.

5.     The District Court' dismissal of Balogh's Equal Protection claim rests on erroneous premises. The first is that Balogh failed adequately to allege the Appellees' lack of viewpoint neutrality. To the contrary, the Heaphy Report, incorporated by reference into the complaint, provides detailed factual predicates supporting a plausible conclusion the Appellees were actuated by animus toward Balogh and the other pro monument demonstrators. A second erroneous premise is that Balogh's own allegations - specifically, that the CPD in declaring an unlawful assembly shut down the UTR event for all protestors - demonstrated the Appellees' even-handed treatment to both sides. But the pro-monument dissident right protesters and the Antifa / counter- protesters were not on equal footing vis-à-vis the UTR rally. The pro-monument protesters obtained and acted in accordance with a permit to have speakers at the Emancipation park. The Antifa / Counter-demonstrators, by contrast, had no permit and their aim was to prevent the pro-monument event at the park from occurring, or at least occurring peacefully. Declaring an unlawful assembly and shutting down the pro-monument protestors'

abilities to hear speakers at the park, accordingly, was a victory for the Antifa / counter-protestors and a defeat for the pro-monument demonstrators.

6.     The Hecklers' Veto Doctrine, especially as developed in *Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123 (1992), crystallizes the legal rule that governments have affirmative obligations to take action to protect First Amendment speakers against hostile crowds who seek by harassment and threats to shut down those speakers. The Hecklers' Veto Doctrine, accordingly, is directly relevant to this case because it reveals the error in the District Court's holding that governments have no affirmative obligation to protect protestors against public hostility.

## ARGUMENT

## I.    STANDARD OF REVIEW.

This Court reviews the District Court's dismissal of a plaintiff's complaint *de novo*, accepting as true all of the factual allegations in the complaint and drawing all inferences in favor of the plaintiff. *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015). Moreover, in First Amendment cases, courts must make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984). While the complaint must contain sufficient facts to state a claim plausible on its face, it nevertheless need only give

the defendant fair notice of what the claims are and the grounds on which they rest. *Id*. Further, pleading standards require that the complaint be construed liberally in favor of the plaintiff. *Id*. To survive a motion to dismiss, a plaintiff need not demonstrate that his right to relief is probable or that alternative explanations are less likely. *Houck v. Substitute Trustee Services, Inc.,* 791 F.3d 473, 484 (4th Cir. 2015). A court may consider a document outside the complaint when evaluating a motion to dismiss if the document is authentic and integral to the complaint. *Goines v. Valley Community Servs. Bd*., 822 F.3d 159, 164 (4th Cir. 2016).

## II. NEITHER *KESSLER V. CITY OF CHARLOTTESVILLE, ET AL*., No. 20-1704 (4th Cir. Dec. 29, 2022) NOR *TURNER V. THOMAS*, 930 F.3d 640 (4th Cir. 2019) IS DISPOSITIVE OF THIS APPEAL.

Judge Moon in his opinion below held that Balogh's claims were "partially foreclosed" by this Court's unpublished opinion in the *Kessler Appellate Decision.* It is certain the appellees in this case will similarly contend that Balogh's present appeal is foreclosed by that *Kessler* decision and also by *Turner v. Thomas*, 930 F.3d 640 (4th Cir. 2019). A quick dismissal of this appeal, however, based on a one-page unpublished decision that expressly states it is not binding precedent (*Kessler*) and a decision (*Turner*) that raised no First Amendment issues flies in the face of America's profound commitment to robust First Amendment freedoms.

The Supreme Court has held repeatedly and with great eloquence that First Amendment freedom "is more than self-expression; it is the essence of self-

government . . . Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. at 452 (internal citations omitted). There could hardly be a more appropriate case than the present appeal for upholding and vindicating this commitment to free expression. The Charlottesville events have become such a climacteric for American culture that Charlottesville remains and will long remain a symbol of deep divisions and challenges to the rule of law within our country. Avoiding these dramatic and important issues by shunting their review into an unpublished per curiam decision is not the path to resolution or healing of the painful national issues Charlottesville has made manifest. Balogh's appeal deserves to be addressed fully and on its own merits.

Moreover, the *Kessler* Appellate Decision is flawed because the underlying District Court opinion it summarily affirmed was flawed, not least in that Judge Moon's opinion employed a highly selective misreading of the Heaphy Report, as explained in the Statement of the Case and Argument II of this brief.

The *Turner* decision is also not dispositive of this appeal. No First Amendment issues were raised in that case – and certainly not the Heckler's Veto issues, unsurprisingly given that the plaintiff himself was allied with the hecklers. Nor was the robust factual background of the Heaphy Report, which is never

mentioned by the Fourth Circuit in *Turner*, presented. The *Turner* decision thus addresses only a small subset, if any, of the important issues presented in this appeal.

## III. THE GOVERNMENT MAY NOT RELY ON ANTIFA HOSTILITY AS AN EXCUSE NOT TO PROTECT BALOGH'S EXERCISE OF HIS FUNDAMENTAL FIRST AMENDMENT RIGHTS.

The critical issue raised by this appeal is whether the Appellees are entitled to rely on Antifa hostility as an excuse not to protect, by inaction or affirmative conduct, Balogh's exercise of his fundamental rights. It is axiomatic that they cannot. *Cox v. Louisiana,* 379 U.S. 536, 551 (1965); *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963); *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963); *Cooper v. Aaron*, 358 U.S. 1, 16 (1958); *Terminiello v. City of Chicago*, 337 U.S. 1  (1949). Here the Appellees committed themselves to a combination of both inaction and affirmative conduct to thwart Balogh's First Amendment rights. And they did so knowing full well that Balogh (and those like him) would face hostility much more potent than the handful of Muslim teens throwing water bottles and garbage in *Bible Believers,*  805 F.3d at 261, a case in which the Sixth Circuit, to its great credit, upheld the robust view of First Amendment freedoms so long and eloquently defended by Supreme Court decisions.

Rather than confronting the vile tactics of Antifa, the Appellees chose to channel Balogh and those like him into a direct confrontation with the Antifa on Market Street. Appellees themselves therefore exploited that violence as a pretext

for thwarting Balogh's First Amendment rights. As admitted in the Heaphy Report commissioned by the City, the plan all along was "to declare the event unlawful and disperse the crowd." HR at JA205. That plan, then, was predicated on unlawful violence. Code of Virginia, §18.2-406.

It is no answer to state, as Judge Moon did below, that "[there] is a large gap between the circumstances the Sixth Circuit faced in *Bible Believers*" and those presented in Balogh's complaint because "'a lot of people were hurt and beaten on both sides,' a far cry from the peaceful – even if highly offensive –protests of the *Bible Believers*." *Kessler v. Charlottesville*, 441 F.Supp.3d at 289. According to Judge Moon, the violence at the UTR rally was not due to "any affirmative act on behalf of" Appellees, but rather "the product of tension between protesters and the counter-protesters." *Id.* The Fourth Circuit's unpublished opinion echoed Judge Moon: "the [UTR] rally attendees engaged in proactive violence against counter-protesters." This is head in the sand jurisprudence and unless this Court is intent on "maintaining a veneer of infallibility" rather than "correcting fundamental missteps" (*Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 252 (D.C. Cir. 2021) (J. Silberman, dissenting), the Court needs to revisit its analysis.

In the first place, the fact that the CPD was causing violence by affirmative acts was not lost on anyone with eyes at the UTR rally. At least one member of the CPD openly stated that their effort was "causing confrontations and pushing [the

34

Alt-Right] right into their enemies." HR at JA242. Then, too, metaphysical distinctions between when the CPD could be said to be "acting" as opposed to merely "not acting" are inapposite: when Chief Thomas and those like him set up the police behind metal barriers on Market Street away from the open areas, "guarding an empty parking lot" (*id.*), with orders to, in the colorful words of Lieutenant Mooney, do nothing but probe their scatology (*id.*), those are actions, and they had perfectly foreseeable and intended consequences.

Nor can the violence at the UTR rally be fobbed off by abstract references to "tension" between ideologically opposed groups. Tension is a mental state. When the Antifa showed up with cement cans "to fight, to disrupt, and even to throw urine and feces," and did just that, what the Court is looking at is assault, not subjective feelings of "tension." The tension would have relaxed considerably if Appellees had set the tone early with arrests, provided barricades, and a police escort, as it had done just a month earlier for the Klan.

Contrary to Judge Moon (*Kessler v. Charlottesville,* 441 F.Supp.3d at 289), this does not amount to a demand that the police need go down with the speaker in order to ensure First Amendment rights. That is a straw man argument. How much effort must be made to enforce the law would be determined as circumstances dictate. But as the Sixth Circuit has noted, "before removing the speaker due to safety concerns, and thereby permanently cutting off his speech, the police must first

make bona fide efforts to protect the speaker from the crowd's hostility by other, less restrictive means." *Bible Believers,* 805 F.3d at 255. There is no bona fide effort when the police have been ordered to first sit on their thumbs and then remove the speakers not from a hostile crowd but directly into the hostile crowd on Market Street.

And again, contrary to Judge Moon, there is no evidence that bona fide efforts would have been futile due to the "actual and extreme" violence. *Kessler v. Charlottesville,* 441 F.Supp.3d at 289. It is notable that the sole attempt to quell violence (by Lieutenant Hatter at approximately 10:30 am, when he jumped his barricade to protect a UTR attendee – HR at JA235) was successful. Indeed, it appears the violence only grew to such "actual and extreme" stages when the CPD failed to follow the lead of those like Lieutenant Hatter. It was only as police inactivity became apparent – viz. "officers stood behind the barricades and watched" (HR at JA237) – that Market Street actually descended into chaos.

Notably, the Heaphy Report explains that just minutes after Lieutenant Hatter had intervened, the Antifa cleared away from Market Street:

> Pole camera footage shows that at 10:36 a.m., Reverend Sekou walked down to the crowd [of counter-protesters] that was gathering around the bottom of the staircase and got them to

move away to clear the area . . . Ann Marie Smith[3] and Rebekah
Menning were part of the group that formed a line at the top of
the stairs. They indicated that Antifa counter-protesters had
agreed to "stand down" as the Alt-Right demonstrators
approached. Antifa indicated, however, that they would "jump in
if things got violent." Smith and Menning told us that they
expected to be arrested for blocking entry to Emancipation Park.
But officers did nothing. As indicated above, the closest police
officers were behind two rows of barricades on 2nd Street NE,
discussing their hope that the clergy would keep others out of the
park.

HR at JA236.

Just as the Antifa group cleared from the street in front of the clergy blockade,

a large column of UTR demonstrators wielding shields arrived from the east. By

10:52, however, the hostile crowd of counter-protesters had noted the surprising

police inactivity. HR at JA237. And at that point, the counter-protesters came back

and, in the words of one Captain Shiftlett, began "trying to take over the street." *Id.*

That appears to be when brawling began in earnest. *Id*. Pursuant to Chief Thomas's

order "officers stood behind the barricades and watched." *Id.*

In another ten minutes, "Market and Second Street descended into chaos."

HR at JA239. It was about this time (at approximately 11:01 am according to the

---

[3] Apparently, the same woman who had found the police protection of the Klan's
First Amendment right so disturbing. See HR at JA165. Given that she could speak
for Antifa's intentions on this latter occasion, it is clear that Lieutenant Hatter
correctly observed that Antifa were in fact coordinating with locals. See HR at
JA158.

post mortem -- HR at JA239-240) that the police on the ground at Market Street called into Chief Thomas and requested a declaration of unlawful assembly. Thanks to demonstrated police inaction, Appellees now had their free space for unlawful acts of force and violence. Code of Virginia, §18.2-406. (Actually, Chief Thomas waited a full half hour for more brawling and violence to occur before he called for a declaration of unlawful assembly. It appears that between 10:51 am and 11:13 am is when he stated, "Let them fight, it will make it easier to declare an unlawful assembly." HR at JA240). But it need not have been so.

The Sixth Circuit, in robustly defending the First Amendment rights of a dissident minority stated:

> We do not presume to dictate to law enforcement precisely how it should maintain the public order. But in this case, there were a number of easily identifiable measures that could have been taken short of removing the speaker: e.g., increasing police presence in the immediate vicinity, as was requested; erecting a barricade for free speech, as was requested; arresting or threatening to arrest more of the law breakers, as was also requested; or allowing the Bible Believers to speak from the already constructed barricade to which they were eventually secluded prior to being ejected from the Festival.

*Bible Believers,* 805 F.3d at 254.

Increasing police presence in the immediate vicinity, erecting barricades, and arresting or threatening arrest, and even removing the speaker from a hostile crowd, were also clearly possible at the UTR rally.

38

Judge Moon– and by extension, the Fourth Circuit in affirming him – have also made much of the fact that (allegedly) "violence [at the Unite the Right rally] was not solely attributable to Antifa."  In particular, Judge Moon comes back to the passage in the City's Heaphy Report that states: "Unite The Right demonstrators pushed forward with their shields and hit the counter-protesters with flagpoles. Open source video footage shows demonstrators violently jabbing the poles at counter-protesters' faces. The counter-protesters fought back and tried to grab the flagpoles away. Eventually, the demonstrators pushed the counter-protesters away with brute force and a cloud of pepper spray." (Judge Moon cited this passage twice -- *Kessler v. Charlottesville*, 441 F.3d at 283 and 289)

But this again ignores the larger context. The prior passages on that page indicate that the counter-protesters in question were allied with the Antifa. HR at JA237. Indeed, they are the ones who Captain Shiftlett noted were "trying to take over the street" in the wake of police inactivity. And the actual video link in the report (Note 234 of the Heaphy Report) clearly depicts Antifa (those holding a large banner reading "You Fascist Scum" is legible) visible alongside the more respectable looking counter-protesters, twirling large poles of their own, waiting for the Alt Right to arrive. The "Open source video" contained in the Heaphy Report footnote does not actually reveal who started the violence.

It is at this point that Rule 12 assumptions should govern. Appellees were not the only ones with prior concrete experience with the Antifa – in the year prior to Unite the Right, Alt Right partisans had violent clashes with Antifa in places as diverse as "Portland, Berkeley, Sacramento, and Anaheim." HR at JA177. There is no reason they would have learned nothing from such experiences. If Appellees knew that that Antifa could be expected "to fight, to disrupt, and even to throw urine and feces," so too did the partisans of the Alt Right.

Shields and flagpoles (and helmets) were called for under such circumstances. Had Appellees done their job, they would not have been needed. But as the saying goes, better to be judged by twelve than carried by six. Martyrdom may be enjoined on Christians at some point, but over against such responsibilities are the obligations of men with lawful rights in a republic. It is a long and venerable tradition on these shores, going back to our Declaration of Independence, to resort to self-help to secure such rights where the governing authorities refuse to do so, e.g. "to provide new Guards for their future security" https://www.archives.gov/founding-docs/declaration-transcript. The Alt Right may have hedged their bets in calculating (correctly) that Appellees would not act to secure their rights. But in light of what unfolded, decent men can only say, "quite right, too." There is no requirement in our law to accept martyrdom, and neither Judge Moon's ipse dixit nor that of any other authority makes it so.

Put another way, if the police can opt not to go down with the speaker, the speaker can opt not to go down at all. He should not be denied any redress for his courage, unless what the judiciary now requires is a nation of spineless thralls.

Finally, only a tortured reading of *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989), and its progeny in the Fourth Circuit, *Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015) and *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995), would compel the conclusion that there was no affirmative misconduct by Appellees. *Kessler v. City of Charlottesville*, 441 F.3d at 286. If, in the state-created danger doctrine, there is a line between state actors who throw others to lions and those who merely fail to provide protection from lions at large (*Doe v. Rosa*, 795 F.3d at 439; *Pinder v. Johnson,* 54 F.3d at 1177), Appellees surely crossed it here. They certainly crossed it when throwing Balogh out of the park to the Antifa jackals waiting on Market Street.

But even before that, *DeShaney* and progeny recognize two exceptions. The first is where "the individual and the state have a 'special relationship," that gives rise to an affirmative duty to protect. *Turner,* 930 F.3d at 645. But here Appellees had that special relationship by virtue of Judge Conrad's order.

The second exception is (again) the state created-danger doctrine. *Id*. The Fourth Circuit has recognized that "'[a]t some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused.'"" *Turner,* 930

41

F.3d at 646 (quoting *Pinder,* 54 F.3d at 1175). The Fourth Circuit saw no such liability in *Pinder*, but the facts of the case are distinguishable. We should rather ask, would Pinder be decided differently if Don Pittman were known to be waiting in the parking lot with his matches for Carol Pinder and her children?  Because at that point, he's no longer a lion simply "at large," ready to spring out of the bush unawares. He is a known and proximate threat. As Justice Holmes noted so long ago in another free speech case, "It is a question of proximity and degree." *Schenck v. United States*, 249 U. S. 47, 52 (1919).

If the police had been conducting intelligence on Don Pittman for weeks, and knew for certain that he would be in the parking lot, and in fact had the benefit of unpleasant experience with Pittman in the weeks before he killed when he had tried to burn down the police station, no one of sense could say that assuring Carol Pinder all would be well, let alone forcing her into close proximity with Pittman, would not be far enough on the spectrum between action and inaction. At that point, the police could not simply say, "don't look at us – after all we didn't strike the match." Yet that is analogous to what Balogh and those like him faced at the UTR rally.

The essential issue in this appeal is whether Balogh's complaint, together with the Heaphy Report, adequately allege in accordance with the *Twombly* plausibility standard that the Appellees' actions that led to Balogh's physical injuries and denial of his First Amendment rights were actuated by something other than

constitutionally required viewpoint neutrality. An abundance of facts support a plausible conclusion that viewpoint neutrality was lacking, including: the City of Charlottesville's attempts to revoke Kessler's permit for the UTR rally for purported "safety reasons" while not revoking the permit of Antifa and other counter protestors; the City's aligning itself with the Southern Poverty Law Center, an avowed enemy of the dissident right, by characterizing the UTR rally as a "hate gathering"; the City's refusal to use crowd control measures at the UTR rally that had been successfully deployed at the Klan demonstration a month before to avoid violence and confrontations; and the City's turning a blind eye to Antifa and other counter-protesters' violent tactics and history and deliberately pushing the UTR demonstrators directly into confrontation with Antifa and other counter-protestors.

**IV.  DEFENDANTS / APPELLEES THOMAS AND CRANNIS-CURL ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW ON A MOTION TO DISMISS, WHERE BALOGH'S COMPLAINT, ESPECIALLY IN LIGHT OF THE HEAPHY REPORT, PLAUSIBLY ALLEGED THAT THEY DISREGARDED ESTABLISHED LAW IN NOT PROTECTING BALOGH.**

Police Chief Thomas's involvement in the events and decisions leading to Balogh's injuries has been detailed in prior sections of this brief. The Heaphy Report also details the extensive involvement of Lt. Crannis-Curl of the Virginia State Police in these events and decisions. *See, e.g,* HR – JA228 ("Zone 1 in Emancipation Park fell under leadership of . . .VSP Lieutenant Becky Crinnis-Curl"); HR – JA241

43

(Lieutenant Crannis-Curl told Captain Shifflet that she was going 'off-plan' and was "not going to send arrest teams into the street";  HR – JA270.

Two questions are relevant to qualified immunity: "(1) Has the plaintiff alleged a violation of a federal right? [and] (2) Was the right at issue clearly established at the time of the alleged violation?"  *Turner*, 930 F.3d at 644. Here both questions, unlike in *Turner*, must be answered in the affirmative.

Balogh has clearly alleged enough facts to show First Amendment retaliation. The elements of that claim are: (1) plaintiff engaged in protected First Amendment speech; (2) the government's retaliatory conduct adversely affected that speech; and (3) a causal link exists between the conduct and the adverse affect. *Nieves v. Bartlett*, 587 U.S. -- , 139 S.Ct 1715, 1725 (2019) .

And contrary to Judge Moon, the right to some level of police protection was clearly established. "To determine whether a right was clearly established, we typically ask whether, when the defendant violated the right, there existed either controlling authority—such as a published opinion of this Court—or a 'robust consensus of persuasive authority…' that would have given the defendants 'fair warning that their conduct was wrongful.'" *Turner* at 644 (*quoting Booker v. S.C. Dept of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017)) . Both a published opinion of this Court and a robust consensus of persuasive authority would have told Chief Thomas and Lt. Crannis-Curl that ordering the police to sit on their thumbs behind barricades

when people come to fight and throw cement cans and feces to disrupt a speaking event was wrongful conduct.

A robust consensus of authority exists in *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 516 (1939); *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940); *Terminiello v. City of Chicago*, 337 U.S. 1, 4-55 (1949); *Edwards v. South Carolina*, 372 U.S. 229, 231 & n.4, 238 (1963); *Cox v. Louisiana*, 379 U.S. 536, 551 (1965); *Gregory v. City of Chi.*, 394 U.S. 111 (1969); and *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963). As the Sixth Circuit noted, this body of binding precedent means that police officers cannot "sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule." *Bible Believers v. Wayne Cnty.*, 805 F.3d at 253. Instead, "the police must first make bona fide efforts to protect the speaker from the crowd's hostility." *Id.* at 255.

And the Sixth is not the only circuit that has drawn that obvious lesson. In *United States v. Kokinda*, 866 F.2d 699 (4th Cir.1989), *rev'd on other grounds*, 497 U.S. 720 (1990), this Court drew the same lesson. The Fourth Circuit approvingly quoted Justice Black's dissent in *Feiner v. New York*, 340 U.S. 315 (1951): "[I]f, in the name of preserving order, [the police] ever can interfere with a lawful public speaker, they first must make all reasonable efforts to protect him." *United States v. Kokinda*, 866 F.2d at 705 (*quoting Feiner,* 340 U.S. at 326-27 (J. Black, dissenting)). A stand down order, coupled with later police action that actually delivers a besieged

45

speaker and his listeners (like Balogh) into the arms of a hostile crowd, cannot, as a matter of law, ever be deemed "reasonable efforts of protection," let alone "all reasonable efforts." Quite the contrary, such actions are calculated, intentional disasters, the very "license to lawless conduct" (*Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)) that qualified immunity is supposed to avoid. They are the work of public officials who know violence is coming and welcome its arrival as an excuse to thwart the First Amendment. Such characters deserve no shelter from this Court.

## V.   THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S *MONELL* CLAIM AGAINST THE CITY OF CHARLOTTESVILLE.

Judge Moon held that the City of Charlotteville's liability under *Monell* failed because only City Manager Jones and not Police Chief Thomas was a final policy maker under local law. This holding, however, ignores the context in which the decisions that led to Balogh's injuries were made, a context in which Thomas continually interacted and coordinated with the City Manager. The Heaphy Report makes this clear.

According to the Heaphy Report, the key people in charge of the CPD's plan were "Chief Thomas, Captain Mitchell, Captain Shifflett, and Captain Lewis" (HR at JA196), although when "asked who was responsible for final decisions in CPD's operational plan, the command staff equivocated." Charlottesville's City Manager Maurice Jones clearly took part in the planning and had influence over it. City Manager Jones held general supervisory powers over the CPD (HR at JA128), and

on August 7, 2017 took part in a meeting with Unite the Right's organizer (Jason Kessler) to ask Mr. Kessler to agree to move Unite the Right to another park. HR at JA190. City Manager Jones was also present in the Command Center across from Lee Park on the morning of the Unite the Right rally, in the very same room as Chief Thomas, where he would watch the chaos unfold in real time on live video feeds. HR at JA216, JA240. That room "was reserved for key decision makers from [the Charlottesville PD] and [the Virginia State Police]." HR at JA216. Presumably, City Manager Jones heard Chief Thomas's "let them fight, it will make it easier to declare an unlawful assembly" statement.

Whether such cooperative and joint decision making is viewed as the City Manager delegating his authority to Chief Thomas, *see, e.g., Crowder v. Sinyard*, 884 F.2d 804, 829 (5th Cir. 1989) or ratifying Thomas's decisions, *see, e.g., City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988),  or as Thomas implementing the City Manager's directives, the factual basis is present for a plausible conclusion under *Twombly* that the City of Charlottesville's final policymakers are properly held accountable for Thomas's actions and decisions.

## VI.    THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S EQUAL PROTECTION CLAIM.

The District Court in dismissing the Balogh's Equal Protection claim based its decision on three rationales. The first was that Balogh had not adequately alleged the defendants' lack of viewpoint neutrality. The second was that Balogh's

47

allegations in support of his Equal Protection claim were conclusory. The third was that Balogh's own allegations - specifically, that the CPD in declaring an unlawful assembly shut down the UTR event for both pro-monument protesters and the Antifa / counter protesters - demonstrated the defendants' even-handed treatment to both sides. All these rationales are deeply flawed.

First, as previously discussed, there are ample factual allegations from the Heaphy Report supporting a plausible conclusion that the defendants were actuated by something other than viewpoint neutrality. The court's assertion that Balogh's allegations were merely conclusory fails to take into account the relevant detail the Heaphy Report provides.

The court's assertion that the fact that the CPD shut down the UTR event for both the pro monument and Antifa / counter protesters shows that the CPT was even-handed, profoundly skews basic First Amendment jurisprudence. The pro-monument dissident right protesters and the Antifa / counter- protesters were not on equal footing vis-à-vis the UTR rally.

The pro-monument protesters obtained and acted in accordance with a permit to have speakers at the Emancipation park. The Antifa / Counter-demonstrators, by contrast, had no permit and their aim was to prevent the pro-monument event at the park from occurring, or at least occurring peacefully. Declaring an unlawful assembly and shutting down the pro-monument protestors' abilities to hear speakers

at the park, accordingly, was a victory for the Antifa / counter-protestors and a defeat for the pro-monument demonstrators. If, to illustrate, a group obtained a permit to conduct a demonstration on some controversial issue – and there are many in our society today -- and attempted to attend that demonstration but were met with violent opposition by ideological adversaries; and then government officials, motivated by animus toward the group that obtained the permit declared an unlawful assembly and shut down the demonstration entirely; no one could fairly describe this as even-handed treatment consistent with the Equal Protection of the laws. This paradigm fully applies to the factual allegations Balogh has presented.

## VII.   THE HECKLERS' VETO DOCTRINE IS DIRECTLY RELEVANT TO KEY ISSUES IN THIS CASE.

In rejecting the relevance of the First Amendment and Hecklers' Veto doctrine to this case, Judge Moon stated: "The Fourth Circuit [in *Kessler*] recognized that the First Amendment did not impose an affirmative obligation on the City and its officials to prevent public hostility to the events of the UTR rally. . . . As in *Kessler*, Plaintiffs' Complaint lacks any plausible allegation that the unlawful assembly declaration and dispersal order discriminated based on content or viewpoint. . . . Nor did Defendants impose an effective 'heckler's veto.'" JA332-333 (internal citations and quotations omitted). In those three sentences, the court committed three errors.

First, Balogh is not contending that the defendants "imposed" a heckler's veto. More accurately stated, Balogh contends that the defendants improperly allowed

49

Antifa and other counter-protestors to impose a heckler's veto. This accords with the basic definition of the Hecklers' Veto Doctrine. *See, e.g., Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) (heckler's veto is a threat to the First Amendment "imposed by the successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order. . . Government's instinctive and understandable impulse to buy its peace—to avoid all risks of public disorder by chilling speech assertedly . . . offensive to some elements of the public").

Second, as explained in Argument III and elsewhere in this brief, Balogh's complaint, as supplemented by the Heaphy Report, presents ample plausible allegations of the defendants' discrimination based on content and viewpoint.

Third, the court's statement that the "First Amendment [does] not impose an affirmative obligation on the City and its officials to prevent public hostility" is a dangerous overgeneralization. There are in reality important and relevant contexts in which the First Amendment imposes affirmative obligations on governments and their officials to protect against public hostility. As scholars have noted, "Heckler's veto case law can be interpreted as guaranteeing that 'local government must take action to protect [a] speaker against a hostile crowd.'" Brett G. Johnson, *The Heckler's Veto: Using First Amendment Theory & Jurisprudence to Understand Current Audience Reactions Against Controversial Speech*, 21 Comm. L. & Pol'y 175, 206 (2016) (quoting Cheryl A. Leanza, *Heckler's Veto Case Law as a Resource*

*for Democratic Discourse,* 35 Hofstra L. Rev. 1305, 1307 (2007)). It is in fact impossible to understand the line of cases originating from *Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123 (1992) and including *Bible Believers* and *New Century Foundation v. Robertson,* 400 F.Supp.3d 684 (M.D. Tenn. 2019) except on the premise that local governments have an affirmative obligation – one that includes providing and paying for substantial and effective police presences – to protect the rights of controversial speakers to express their views unmolested by hostile audiences. The Hecklers' Veto Doctrine crystallizes these affirmative obligations and, accordingly, the District Court and the unpublished *Kessler* Fourth Circuit opinion erred in dismissing the doctrine as irrelevant.

## CONCLUSION

For the reasons stated, Balogh requests that the District Court's April 27, 2023, opinion and order be reversed and the case remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

As this case presents complex and important issues, Balogh  submits that oral argument would benefit the Court and he accordingly requests it.

Respectfully Submitted,

*Counsel for Appellants*

  */s/ Glen K. Allen*
Glen K. Allen
Glen K. Allen Law
5423 Springlake Way
Baltimore, MD 21212

  */s/ Frederick C. Kelly, III*
Frederick C. Kelly, III
Law Office of Frederick C. Kelly
One Harriman Square
Monroe, NY 10950

## CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This document contains <u>12,323 words</u>.

2.     This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in <u>14-point Times New Roman</u>.

This the 11th day of September, 2023.

                    */s/ Glen K. Allen*
                    Glen K. Allen
                    Glen K. Allen Law
                    5423 Springlake Way
                    Baltimore, MD 21212