**NO. 23-1581**

In The

# United States Court Of Appeals

## For The Fourth Circuit

**WARREN BALOGH,**

*Plaintiff - Appellant,*

**v.**

**COMMONWEALTH OF VIRGINIA; TERENCE R. MCAULIFFE;
VIRGINIA STATE POLICE; STEVEN FLAHERTY;
BECKY CRANNIS-CURL; BRIAN JOSEPH MORAN;
CITY OF CHARLOTTESVILLE; MICHAEL SIGNER; WES BELLAMY;
CHARLOTTESVILLE POLICE DEPARTMENT; AL THOMAS, JR.;
EDWARD GORCENSKI; SETH WISPELWEY; DWAYNE DIXON;
DARYL LAMONT JENKINS; LACEY MACAULEY,**

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT CHARLOTTESVILLE

———————————

## REPLY BRIEF OF APPELLANT

———————————

Glen K. Allen                                Frederick C. Kelly, III
GLEN K. ALLEN LAW                            LAW OFFICE OF FREDERICK C. KELLY
5423 Springlake Way                          One Harriman Square
Baltimore, MD 21212                          Goshen, NY 10924
(410) 802-6453                               (845) 294-7945

*Counsel for Appellant*                      *Counsel for Appellant*

**TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ...................................................................................... 1

RESPONSE TO APPELLEES' FACTUAL ASSERTIONS .................................. 4

    I.    NEITHER *KESSLER V. CITY OF CHARLOTTESVILLE, ET AL.*, No. 20-1704 (4th Cir. Dec. 29, 2022) NOR *TURNER V. THOMAS*, 930 F.3d 640 (4th Cir. 2019) IS DISPOSITIVE OF THIS APPEAL ...................................................................................... 7

    II.    THE GOVERNMENT MAY NOT RELY ON ANTIFA HOSTILITY AS AN EXCUSE NOT TO PROTECT BALOGH'S EXERCISE OF HIS FUNDAMENTAL FIRST AMENDMENT RIGHTS ...................................................................... 10

    III.    DEFENDANTS / APPELLEES THOMAS AND CRANNIS-CURL ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW WHERE THEY DELIBERATELY CHANNELED ANTIFA VIOLENCE .................................................. 14

    IV.    THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S *MONELL* CLAIM AGAINST THE CITY OF CHARLOTTESVILLE ...................................................................... 17

    V.    THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S EQUAL PROTECTION CLAIM ................................. 19

    VI.    THE HECKLERS' VETO DOCTRINE IS DIRECTLY RELEVANT TO KEY ISSUES IN THIS CASE .............................. 20

CONCLUSION ......................................................................................... 22

REQUEST FOR ORAL ARGUMENT ................................................................ 22

CERTIFICATE OF COMPLIANCE ................................................................... 23

## TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................13

*Bible Believers v. Wayne County, Mich.*,
  805 F.3d 228 (6th Cir. 2015) ..............................................7, 8, 10

*Brosseau v. Haugen*,
  543 U.S. 194 (2004)......................................................................15

*City of St Louis v. Praprotnik*,
  485 U.S. 112 (1988)......................................................................17

*Cooper v. Aaron*,
  358 U.S. 1 (1958).........................................................................10

*Counterman v. Colorado*,
  600 U.S. 66 (2023).....................................................................9, 10

*Cox v. Louisiana*,
  379 U.S. 536 (1965)...........................................................10, 11, 14

*DeShaney v. Winnebago Cnty, Dep't of Soc. Servs.*,
  489 U.S. 189 (1989)............................................................8, 12, 13

*Dwares v. City of New York*,
  985 F.2d 94 (2d Cir. 1993) .........................................................13, 20

*Edwards v. South Carolina*,
  372 U.S. 229 (1963)...........................................................10, 11, 14

*Gregory v. City of Chicago*,
  394 U.S. 111 (1969)...........................................................10, 11, 14

*Hedges v. Wauconda Cmty Unit Sch. Dist. No. 118*,
  9 F.3d 1295 (7th Cir. 1993) .......................................................... 8-9

ii

*Hernandez v. City of San Jose*,
  897 F.3d 1125 (9th Cir. 2018) ................................................................*passim*

*Hope v. Pelzer*,
  536 U.S. 730 (2002)..........................................................................................15

*Hunter v. Town of Mocksville*,
  897 F.3d 538 (4th Cir. 2018) .........................................................................18

*Kessler v. City of Charlottesville, et al.*,
  No. 20-1704 (4th Cir. Dec. 29, 2022)...................................................7, 8, 10

*Lewis v. Clarke*,
  581 U.S. 155 (2017)..........................................................................................19

*Ovadal v. City of Madison, Wisconsin*,
  416 F.3d 531 (7th Cir. 2005) ...........................................................................8

*Palko v. State of Connecticut*,
  302 US 319 (1937)..............................................................................................3

*Pinder v. Johnson*,
  54 F.3d 1169 (4th Cir. 1995) ...........................................................7, 8, 12, 13

*Rock for Life – UMBC v. Hrabowski*,
  411 Fed. Appx. 541 (4th Cir. Dec. 16, 2010)...............................................3, 8

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949)......................................................................3, 10, 12, 14

*Turner v. Thomas*,
  930 F.3d 640 (4th Cir. 2019) .......................................................................7, 8

*United States v. Kokinda*,
  866 F.2d 699 (4th Cir. 1989), *rev'd on other grounds*,
  497 U.S. 720 (1990)..........................................................................................14

*Watson v. City of Memphis*,
  373 U.S. 526 (1963).....................................................................................10, 11

iii

**Constitutional Provisions:**

U.S. Const. amend. I ...........................................................................*passim*

**Other Authorities:**

Brett G. Johnson, *The Heckler's Veto:  Using First Amendment Theory and Jurisprudence to Understand Audience Reactions Against Controversial Speech,*
 21 Comm. L. & Pol'y 175 (Spring 2016)...........................................9

**Rules:**

Fed. R. Civ. P. 12 .............................................................................14, 16

**INTRODUCTION**

Appellees' opposition brief merges crucial factual concessions and misstatements with fundamental legal errors. The brief reinforces the conclusion that this Court should fully and forthrightly address the important issues this case presents and rectify the flagrant errors committed by the District Court.

Notwithstanding the misstatements of law, Appellees do not attempt to dispute four key facts in the record. First, they do not dispute that Appellees maintained ideological alliances with the Antifa counter-protestors, who had come to prevent the UTR rally through quaint practices involving cement cans and urine bombs. (JA195, JA259, JA262 for the quaint practices; JA135-136, JA158, JA163, JA169-170 for Appellees' alliances.) Second, Appellees neither dispute nor address the fact that the Antifa counter-protestors outnumbered the UTR partisans by a ratio of two to one. JA177. Third, Appellees concede that, after first attempting to deny the UTR rally a venue in Emancipation / Lee Park (which failed in the courts), they settled on a strategy – which was communicated on the morning of the UTR rally to the rank and file police well before the violence started — of declaring an unlawful assembly and dispersing the crowd. JA205. And fourth, Appellees concede that the state actors dispersed the crowd not by removing unpopular speakers and attendants *from* a larger hostile crowd. Instead, they removed the unpopular speakers and attendants *into* the larger hostile crowd. JA242.

Appellees' arguments proceed as though they had not conceded these four facts. Yet they are decisive. The pre-determined plan to declare an unlawful assembly cannot be deemed content and viewpoint neutral when it was predicated on violence that would be inflicted primarily by Appellees' ideological allies. Nor can it be reconciled with basic principles of Equal Protection. The lazy "pox on both houses" analysis by the District Court ignores the ugly reality on the streets of Charlottesville on August 12, 2017.

All the cards were held by the counter-protestors. It was they who came intent on depriving Balogh and those like him of their rights to speak (and hear) dissident speech. It was they who enjoyed the license to instigate lawless conduct. It was they who enjoyed such license precisely because of an ideological alliance with the local government, one that held despite, and perhaps even because of, their atrocious treatment of the Charlottesville Police Department (CPD) just a month prior (at the Klan rally). And, in the Hobbesian war that obtains when the state deliberately neglects its obligation to maintain order, it was they who enjoyed the superior weight of numbers, a crucial factor which would obviously tell when the police stood down. Put simply, Chief Thomas did not need to give orders to club only the UTR attendees when he knew full well the Antifa were waiting on Market Street, in numbers two to one, to do the clubbing for him. No state actors who cooperate with such lawlessness merit qualified immunity.

2

Appellees compound these basic factual flaws with fundamental legal errors. Foremost among them is their repeated contention that the Constitution is merely a "document of negative restraints" that imposes no affirmative obligations even in a First Amendment context. That analysis may have relevance when something as nebulous as due process rights are concerned, but where the right to free speech is in play we deal with "the matrix, the indispensable condition, of nearly every other" freedom under our Constitution. *Palko v. State of Connecticut*, 302 US 319, 327 (1937). In a First Amendment context such as the present one, accordingly, as this Court itself stated in *Rock for Life – UMBC v. Hrabowski*, 411 Fed. Appx. 541 (4th Cir. Dec. 16, 2010):

> Courts have recognized a heckler's veto as an impermissible form of content-based speech regulation for over sixty years. *See Terminiello v. City of Chicago,* 337 U.S. 1 (1949) . . . Repeatedly, courts have emphasized the state's responsibility to permit unpopular or controversial speech in the midst of a hostile crowd reaction.
>
> *Id*. at *544.

But a state does not "permit unpopular speech in the midst of a hostile crowd reaction" when it counts on that hostile crowd to start a riot that will furnish the excuse to shut down the speech.

For these reasons, presented more fully below, Appellees' arguments should be rejected and the District Court's opinion reversed.

## RESPONSE TO APPELLEES' FACTUAL ASSERTIONS

Where Appellees have addressed the factual record in their opposition brief, they have resorted to distortion. The individual quotes at pages 5-6 of Appellees' brief, for example, purport to show that the "true picture" was "mutual combat and violence by both protestors and counter protestors." Ap'lees Br. at 5-6. The point of this, apparently, is merely rhetorical: Appellees hope to show that their ideological allies were supposedly no worse than Balogh's, and thus Balogh should be denied redress under the law.

But such analysis is based on legerdemain, and not simply because Balogh is not a state actor. The first paragraph quoted by Appellees (regarding the UTR protestors bringing various weapons to "confront their political opponents") is taken from JA177. But that very page makes clear it was the "extremely boisterous" counter-protestors who would start the trouble: it was the Antifa who would attempt to disrupt the UTR event, not the other way around. *Id.* Moreover, that very page also contains the first indication that the counter-protestors would hold a two to one advantage in numbers over the Alt Right, a scenario which only favors one side where mob violence occurs. *Id.*

Appellees' next four series of scare quotes are not actually four discrete events at all. They are all taken from a single moment in the same paragraph at JA237, when the League of the South and the Traditional Workers Party (*viz.* the group

4

specifically identified by the FBI as not likely to cause trouble – *see* JA177) were confronted by counter-protestors intent on denying them access to Lee Park. Just before the brawling erupted, the CPD again noted it was Appellees' allies who instigated the trouble. Spurred on by the fact that no one from the CPD had done anything to quell Antifas violence since Lt. Hatter had intervened almost half an hour earlier (*see* JA234-235), the Antifa had reappeared and, in the contemporaneous observation of one Captain Shiftlett, were "trying to take over the street." JA237. Office Hulme of the CPD concurred: it was the counter-protestors who were "blocking the passage." JA237. Although prepared for combat if necessary, the UTR attendees were not primarily looking to fight; they simply wanted access to Lee Park to hear speeches that Appellees had been ordered to permit. *Kessler Injunction Opinion*, 2017 WL 3474071. This is reflected in Officer Hulmes's present-time observation, "This is going to get ugly… This is going to get really ugly *if they don't get out of the way*." JA237 (emphasis supplied). In other words, the League of the South and Traditional Workers Party would fight if the counter-protestors continued to obstruct their passage, but not otherwise. This was precisely what the "thorough and accurate" intelligence sources, including the FBI and the ADL, had predicted. Unlike the self-anointed partisans of tolerance who were Appellees' allies, the UTR attendees were not in Charlottesville primarily to fight or deny others the right to speak. They were there to listen, but would fight if pressed.

5

Next, Appellees make reference to "bottles and balloons filled with unknown" substances flying through the air. But the context here, at JA239-240, is Market Street at roughly 11 a.m., when the scene has already descended into chaos due to pre-determined police inaction. The UTR protestors, such as Balogh, having been deprived of the rule of law, had been forced to form human shield walls "to push the counter-protesters back" who had come to disrupt their event. And while the Heaphy Report does not indicate who is throwing what, "balloons filled with unknown substances" point toward a favored tactic of the Appellees' ideological allies.

The last four events listed by Appellees (i.e., the "belligerent Alt-Right demonstrators" throwing objects and insults at the Antifa from the southeast entrance to Lee Park, JA240; "demonstrators and counter-protestors… attacking each other with sticks" inside the park, JA241; a KKK Leader and his handgun, which was convincingly *and safely* deployed to dissuade a black man from menacing people with a blowtorch, JA243; and a UTR demonstrator punching a woman in the face, an act which garnered prosecution and the maximum jail time penalty, JA243 and Note 327 at JA312) all occurred after 11:30 a.m., by which point Chief Thomas had already let Appellees' allies in the larger, violent mob run riot for an hour.

Moreover, these events occurred *after* the declaration of unlawful assembly. As such, they cannot be reasons why Appellees declared the unlawful assembly, as Appellees' misplaced argument asserts. And certainly none explain why, on the

morning of August 12, 2017, well before the UTR rally even began, Appellees had communicated to the rank and file police that the plan already in place was to wait to declare an unlawful assembly and shut down the speech.  JA205.

## I.    NEITHER *KESSLER V. CITY OF CHARLOTTESVILLE, ET AL.*, No. 20-1704 (4th Cir. Dec. 29, 2022) NOR *TURNER V. THOMAS*, 930 F.3d 640 (4th Cir. 2019) IS DISPOSITIVE OF THIS APPEAL.

As Balogh expressed in his opening brief, the Charlottesville UTR rally has become a dramatic symbol of the culture wars that now beset our nation and the challenges these conflicts place on our First Amendment traditions. Balogh's complaint and appeal present these First Amendment challenges in their full intensity.  Other circuits, for example the Sixth Circuit in *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228 (6th Cir. 2015) and the Ninth Circuit in *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018), in less epochal cases have not shied away from confronting these difficult but critically important issues. The Fourth Circuit too should fairly confront them – something it has failed to accomplish thus far.  To assert, as Appellees do in their opposition brief, that the Court's unpublished one-page *per curiam* opinion in *Kessler* "squarely addresses" these issues is risible.

Appellees in their brief, at page 11, assert that

*Kessler* and *Turner* are dispositive of Balogh's First Amendment and Equal Protection claims  . . .  because they are based on the same fundamental premise:  the Constitution is "a document of negative restraints, not positive entitlements." *Pinder v. Johnson,* 54 F.3d 1169, 1174 (4th Cir. 1995). It is intended to function as a "limitation on the State's power to act, not as a guarantee of certain minimum levels of

safety and security." *DeShaney v. Winnebago Cnty, Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

This argument actually crystallizes why *Kessler* and *Turner* are *not* dispositive of this appeal: they are based on the wrong fundamental premise. *Pinder* and *DeShaney* are not First Amendment cases. It is decisive error to transplant general statements from those cases as the rationale in a First Amendment context, such as this one. In a First Amendment setting, the Constitution does indeed impose affirmative obligations on the government.

As mentioned in the Introduction, the Fourth Circuit's *Rock for Life – UMBC v. Hrabowski* case that Appellees themselves cite and rely upon states this clearly. A wealth of authority, in addition to *Bible Believers* and *Hernandez*, corroborates this articulation of the law. *See, e.g., Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531, 537 (7th Cir. 2005) (cited favorably in *Rock for Life – UMBC*) ("It cannot be denied that drivers who yelled, gestured, and slammed on their brakes when they saw Ovadal's signs created a safety hazard on the Beltline. However, it is the reckless drivers, not Ovadal, who should have been dealt with by the police, perhaps in conjunction with an appropriate time, place, and manner restriction on Ovadal. The police must preserve order when unpopular speech disrupts it; '[d]oes it follow that the police may silence the rabble-rousing speaker? Not at all. The police must permit the speech and control the crowd; there is no heckler's veto.'") (quoting *Hedges v. Wauconda Cmty Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir.

8

1993));  Brett G. Johnson, *The Heckler's Veto:  Using First Amendment Theory and Jurisprudence to Understand Audience Reactions Against Controversial Speech,* 21 Comm. L. & Pol'y 175, 206-211, 206, 210-11 (Spring 2016) ("First Amendment theory can be broken into two distinct branches: affirmative theory and negative theory. The principle of the heckler's veto sits at the crossroads of these two branches. Heckler's veto case law can be interpreted as guaranteeing that 'local government must take action to protect [a] speaker against a hostile crowd.' This principle is consistent with so-called affirmative theories of the First Amendment, which generally put forth the position that the government has a duty to foster and facilitate certain conditions through which citizens can exercise their First Amendment rights . . . Hostile audience cases, thus, become the supreme test of tolerance by state actors toward extreme speech. Faced with the potential for popular disapproval of a message to turn violent, state actors must refrain from acquiescing to the popular will and protect the rights of speakers to share their unpopular message rather than punish them for angering the audience. This principle reflects a deep respect for the value of unpopular messages within American democracy.") (footnotes omitted).

In the Supreme Court's recent *Counterman v. Colorado*, 600 U.S. 66 (2023) decision – the latest in the Supreme Court's long tradition of protecting robust First Amendment speech – the Court placed particular emphasis on the dangers of chilling

free expression that arise from leaving the populace in doubt as to when they may or may not exercise their First Amendment rights. *See id*. at 75-76. The Sixth and Ninth Circuits in *Bible Believers* and *Hernandez* have spoken loudly and clearly in defense of First Amendment principles and thereby abated the risks of chilling free expression. In the Fourth Circuit, by contrast, the perils of participating in classic public forum and permitted demonstrations in which determined and violent counter-protesters may appear are immense and the chilling effects of these perils quite profound. Balogh respectfully submits that the importance of the issues raised in this appeal require greater judicial leadership from the Fourth Circuit than has been shown by its one-page, unpublished, *per curiam* decision in *Kessler*.

## II.  THE GOVERNMENT MAY NOT RELY ON ANTIFA HOSTILITY AS AN EXCUSE NOT TO PROTECT BALOGH'S EXERCISE OF HIS FUNDAMENTAL FIRST AMENDMENT RIGHTS.

As Balogh stated in his opening brief, the critical issue raised by this appeal is whether the Appellees may rely on Antifa hostility as an excuse not to protect, by inaction or affirmative conduct, Balogh's exercise of his fundamental rights. Decisive Supreme Court precedents show they cannot. *See, e.g., Cox v. Louisiana,* 379 U.S. 536, 551 (1965); *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963); *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963); *Gregory v. City of Chicago*, 394 U.S. 111 (1969); *Cooper v. Aaron*, 358 U.S. 1, 16 (1958); *Terminiello v. City of Chicago*, 337 U.S. 1 (1949).

Appellees in their opposition brief attempt to distinguish *Edwards, Cox*, and *Gregory* on the ground that these cases did not involve "violent interactions between speakers and observers." Ap'lees Br. at 18-19. This misstates the circumstances of those cases.[1] If there were no violent interactions between speakers and hostile crowds in those cases, it was only because the local governments were more scrupulous than Appellees were here and did not intentionally foster circumstances that led to violence. Clearly, that potential was present in such cases (*Edwards* at 238-39; *Cox* at 550; *Gregory* at 116), but the segregationist authorities there did nothing as malicious as press the civil rights demonstrators into the maw of hostile crowds.

The Court in *Cox* made clear that "Governmental authorities have the duty and responsibility to keep their streets open and available for movement, " (379 U.S. at 554-55), but Appellees made sure they abandoned that duty here, *e.g.,* forcing the League of the South and Traditional Workers Party to resort to self help when the Antifa counter-protestors either struck first or refused to clear the way.[2] Had the local authorities in *Cox* and the other cases behaved as Appellees did and waited for

---

[1] *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) does appear to present a rather abstract pattern removed from any immediate violence.

[2] Moreover, as noted in Balogh's opening brief (and once again not disputed by Appellees), the open source video footage cited by the Heaphy Report at Note 234 fails to reveal who actually struck first in this particular round of violence, though the counter-protestors clearly initiated the lawless conduct.

11

actual violence to erupt, surely the Supreme Court would not have denied the dissident speakers any redress. If anything, the holdings against the local authorities would have been much harsher than they were.

Moreover, Appellees have failed to address *Terminiello v. City of Chicago*, 337 U.S. 1 (1949). Actual violence from a hostile crowd was found in that case and yet the rights of dissident speakers were vindicated nonetheless.

Appellees also make two arguments regarding the application of the *DeShaney* and *Pinder* cases to this appeal. First, they contend that the *DeShaney* exceptions – for state created danger and a special relationship -- do not protect Balogh. Second, they question whether *DeShaney* and *Pinder* should even be applied in a First Amendment context. Ap'lees Br. at 12-16.

Turning to the second argument first, Balogh agrees that *DeShaney* and *Pinder* should not govern this First Amendment case. Doing so is akin to hammering a square peg into a round hole. *DeShaney* and *Pinder* were fashioned to address Due Process, not First Amendment claims. This does not mean, however, that state actors such as the Appellees have no affirmative duties in a First Amendment setting to dissidents such as Balogh. To the contrary, removing the unnecessary *DeShaney / Pinder* overlay reveals with greater clarity that, for the reasons explained in the prior section of this brief, the state actors incontrovertibly have such duties.

Turning to the Appellees' first argument and assuming *DeShaney* and *Pinder* apply, Balogh has properly invoked the *DeShaney* exceptions, especially given the procedural posture of this case, i.e., an appeal from the grant of a motion to dismiss. It is an understatement to say that Balogh's allegations, fortified by the Heaphy Report, present a plausible case in accordance with *Twombly* standards that Balogh and the other dissidents were essentially under the state actors' custodial control when the state actors pushed the dissidents directly into confrontations with the hostile Antifa. Other Circuit Courts on similar facts have upheld the *DeShaney* exceptions and rejected motions to dismiss. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1133-35 (9th Cir. 2018) (*DeShaney* exception upheld in case where police officers prevented attendees at pro-Trump political rally from leaving through alternative exits and directed them into a crowd of violent anti-Trump protestors); *Dwares v. City of New York*, 985 F.2d 94, 98-99 (2d Cir. 1993) (plaintiffs sued police and other state actors in connection with a flag-burning demonstration; the plaintiffs alleged the police conspired with skinheads to permit the skinheads to assault the plaintiffs with impunity; the District Court dismissed complaint on *DeShaney* grounds but the Second Circuit reversed).

III.  **DEFENDANTS / APPELLEES THOMAS AND CRANNIS-CURL ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW WHERE THEY DELIBERATELY CHANNELED ANTIFA VIOLENCE.**

Appellees' argument for qualified immunity fails for much the same reasons set forth above. They argue that it is of no bearing that Appellees could not preemptively shut down the UTR rally because of fears of violence, because what Appellees faced was actual violence, not remote fears of violence.  Ap'lees Br. at 19.

But this comes back to their Rule 12 violations, for the argument assumes, against the evidence at JA205, JA228, and JA240, that the Appellees did not welcome the violence that occurred (and that the people instigating it were not allied to Appellees).  In a twisted kind of symmetry, Appellees join the fundamental procedural error of misconstruing facts in their favor under Rule 12  with the  cover up of their prior violation of fundamental substantive First Amendment rights.

But construing the facts in Balogh's favor, the reasoning of cases such as *Edwards*, *Cox, Gregory,* and certainly *Terminiello* would all give Chief Thomas and Lt. Crannis-Curl notice that they could not abandon Balogh to lawless Antifa thugs so that they had their riot.

Moreover, even the Fourth Circuit's own *United States v. Kokinda*, 866 F.2d 699 (4th Cir. 1989), *rev'd on other grounds*, 497 U.S. 720 (1990) would have given fair warning that their behavior was unlawful.  Appellees imply that the Fourth Circuit's citation to Justice Black is inapposite because it was *dicta*.  Ap'lees Br. at

18.  But *dicta* sheds light on a court's reasoning, and "The reasoning, though not the holding" would have "sent the same message to reasonable officers" in the Fourth Circuit.  *Hope v. Pelzer*, 536 U.S. 730, 743 (2002).  *See also Hernandez*, 897 F.3d at 1138 (some citations omitted):

> Based on the allegations in the FAC, which we take as true at this stage of the proceedings, we also find that this is "one of those rare cases" in which the constitutional violation "is so 'obvious' that we must conclude . . . qualified immunity is inapplicable, even without a case directly on point."; . . . *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) . . . (per curiam) ("[I]n an obvious case, [highly generalized standards] can clearly establish [a constitutional violation], even without a body of relevant case law." (citation and internal quotation marks omitted). Here, the Attendees allege the Officers shepherded them into a violent crowd of protesters and actively prevented them from reaching safety. The Officers continued to implement this plan even while witnessing the violence firsthand, and even though they knew the mob had attacked Trump supporters at the Convention Center earlier that evening, and that similar, violent encounters had occurred in other cities. Viewed in the light most favorable to the Attendees, these allegations establish "with obvious clarity" that the Officers increased the danger to the Attendees and acted with deliberate indifference to that danger, pursuant to the state-created danger doctrine.

If state actors cannot give in to a hostile crowd to cancel a speaker, they surely cannot behave even worse and let the hostile crowd devolve into an outright riot because they want an excuse to shut down the speech.  Again, Appellees cannot get credit because the likes of Mayor Daley or segregationist Louisiana and South Carolina were models of decency and order in comparison to their own acts.

Continuing their Rule 12 violations, Appellees urge the court to take, at face value, their press conference warnings that law enforcement, fire and EMS services could not "adequately protect people and property in and around Emancipation Park." Ap'lees Br. at 21, citing to JA190. This message (crafted by City Manager Jones and delivered by him to Kessler) was the City's official explanation for why they were attempting to move the UTR rally from the Lee/Emancipation Park to the allegedly safer venue of McIntire Park. JA190. But warning someone that you could not adequately protect them is not at all the same as forcing them into a direct confrontation with their violent enemies. And in any event, the whole "we don't think we can protect you properly at Lee Park" theme was only the City's public face. As the very next page makes clear, behind closed doors Chief Thomas was explicitly hoping that the UTR rally would take place, not at the allegedly safer McIntire Park, but at Lee Park. JA191. Specifically, Chief Thomas "believed that allowing the event to go forward at Emancipation Park would give CPD greater ability to 'maintain control' of the event." *Id*. Of course, by "maintain control" we now know that Chief Thomas meant enough Antifa violence in the close confines of an unpoliced Market Street to declare an unlawful assembly and shut down the UTR rally before it began.

## IV.  THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S *MONELL* CLAIM AGAINST THE CITY OF CHARLOTTESVILLE.

Appellees in their opposition brief accuse Balogh of ignoring the Heaphy Report, which allegedly stated that City Manager Maurice Jones was not even present in the Command Center during the entire period of "chaos and mutual combat."  Ap'lees Br. at 22.

But Appellees cite to JA217, which only states that the City Manager momentarily went to a different floor within the building  to confront Charlotteville's leftwing activist mayor (JA131 and JA138), who was irate at being shut out of the Command Center.  The record simply does not reveal that the City Manager ever left the Command Center for any length of time.  In any event, Appellees fail to respond to the fact that the City Manager took part in the planning for the UTR rally, as when Jason Kessler showed up to discuss how the day would proceed and was met by the City Manager, who attempted to convince Kessler to move the rally.  JA190.

Contrary to Appellees, this is evidence that the City Manager was on board with Chief Thomas and the plan to wait until Antifa violence had reached such an extent that they could issue a declaration of unlawful assembly and shut down the hated UTR rally.  This is, at the very least, "ratification" of lawless conduct which "would be chargeable to the municipality." *City of St Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

17

Ratification of clearly lawless policy is inconsistent with merely "going along with discretionary decisions made by one's subordinates" (*id*.), a scenario where the policy maker is presuming that his subordinates are faithfully following the law. Had City Manager Jones not knowingly ratified the lawless behavior of Chief Thomas and others among Appellees, he would not have attempted to talk Kessler into moving the rally (JA190), he would not have been on the receiving end of Judge Conrad's order (2017 WL 3474071), and he would not have been present in the Command Center "reserved for key decision makers from CPD and VSP." JA216. He was in the Command Center because he was "a key decision maker" for the CPD. Indeed, as Appellees themselves belabor, City Manager Jones was, by statute, the key decision and final policy maker for the CPD. A single decision by him on the day in question would suffice for official policy purposes. *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018). Given Jones' long involvement in the maneuverings by the City of Charlottesville around the UTR rally, we clearly have that and much more.

Nor is Balogh attempting to "amend his complaint in his brief." Ap'lees Br. at 24. As all sides agreed, the Heaphy Report was incorporated into the pleadings and it contains the facts plausibly showing the City Manager's responsibility for the decisions on the day in question. It also shows that the CPD, and not simply the VSP, took part in actions to remove the UTR rally attendees into the Antifa mob on

18

Market Street.  JA240-243.  It was the CPD who declared the unlawful assembly through bullhorns (JA240), and when the UTR protestors protested that they were being driven into the Antifa mob on Market Street, they were found to be yelling at both the VSP and the CPD.  JA242.

Appellees launch other erroneous arguments.  They complain that Balogh did not name City Manager Maurice Jones specifically in his complaint.  But of course he did not need to: Balogh named the City of Charlottesville.  At that point naming the City Manager specifically would have been redundant because such an action would be the equivalent of a suit against the City of Charlottesville.  *Lewis v. Clarke*, 581 U.S. 155, 162 (2017).

## V.    THE DISTRICT COURT ERRED IN DISMISSING BALOGH'S EQUAL PROTECTION CLAIM.

Appellees in their opposition brief contend that Balogh's Equal Protection claim is deficient because the state actors' declaration of an unlawful assembly applied equally to the Antifa / counter-protestors as to Balogh and the pro-monument protestors, dispersing them all.  The proper focus, however, of Balogh's Equal Protection claim is not on the dispersal order itself but on the state actors' conduct leading up to the dispersal order.  Given this proper focus, it is manifest, for the reasons previously explained in detail, that Balogh and the other pro-monument protestors were intentionally and harmfully discriminated against based on their viewpoint, and their rights to Equal Protection, accordingly, were denied. On

19

analogous facts, the Second Circuit in *Dwares* refused to dismiss an Equal Protection claim. *See Dwares*, 985 F.2d at 99.

## VI.  THE HECKLERS' VETO DOCTRINE IS DIRECTLY RELEVANT TO KEY ISSUES IN THIS CASE.

In Balogh's opening brief he explained, as he has in the first argument in this reply brief, the relevance of the Heckler's Veto Doctrine to this litigation.  Appellees in their opposition memorandum respond with two basic arguments. Neither has merit.

First, appellees appear to argue that the Heckler's Veto Doctrine applies only to threats to violently disrupt a speaking occasion, not to the violence itself if it actually materializes – i.e., that if violence actually ensues the state actors may stand down and do nothing. No interpretation of the Heckler's Veto Doctrine that attributes such pigeon-livered inaction to the  government can be reconciled with the oft-repeated high aim of the doctrine to effectively protect dissidents and controversial speakers.

Second,  appellees contend that the nature and extent of the unrest at the UTR rally, which they characterize as "violent, mutual combat" (Ap'lees Br. at 34), renders the Heckler's Veto Doctrine inapplicable.  This contention is flawed both factually and as a matter of legal doctrine.

It is flawed factually because it disregards the state actors' conduct leading up to the violent confrontations.  As explained in detail in Balogh's opening brief and this reply brief, the state actors had it within their power to have prevented the violent

confrontations that occurred at the UTR rally. Actuated by animus toward the ideologies of Balogh and the other pro-monument demonstrators, however, the state actors instead deliberately engineered confrontations by steering the pro-monument demonstrators directly into the maw of the Antifa and other counter-demonstrators. If "mutual combat" occurred after that, it occurred only because of the orchestrations of the state actors.

Appellees' second argument is deficient also from the perspective of legal doctrine. Appellees' "mutual combat" characterization implies that the pro-monument demonstrators and the Antifa / counter protesters were on equal footing with regard to the state actors' responsibilities as to the violence that occurred. This was not so. The pro-monument demonstrators' goal was to present and listen to speeches at the Emancipation Park, and they had a permit to do so. The goal of the Antifa / counter-protestors, by contrast, was to prevent the pro-monument demonstrators from exercising their First Amendment rights. The Appellees' "mutual combat" theory is fundamentally incompatible with the Heckler's Veto Doctrine because this "mutual combat" approach improperly equates the right of hecklers to disrupt controversial speech with the right of controversial speakers to exercise their First Amendment rights.

Appellees spend a large portion of their last argument citing state statutes and federal case law to the effect that government has authority to declare unlawful

assemblies and prevent violence.  Balogh is not contending that there are no possible circumstances in which governments can prevent violence by declaring an unlawful assembly or taking similar measures. Balogh contends, rather, that under the circumstances of this case as alleged in Balogh's  complaint and the Heaphy Report, the conditions that might have justified the declaration of an unlawful assembly were improperly created or facilitated  by the state actors.

## CONCLUSION

For the reasons stated, Balogh requests that the District Court's April 27, 2023 opinion and order be reversed and the case remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

As this case presents complex and important issues, Balogh  submits that oral argument would benefit the Court and he accordingly requests it.

Respectfully Submitted,

/s/ Glen K. Allen
Glen K. Allen
GLEN K. ALLEN LAW
5423 Springlake Way
Baltimore, MD  21212
(410) 802-6453

Frederick C. Kelly, III
LAW OFFICE OF FREDERICK C. KELLY
One Harriman Square
Goshen, NY 10924
(845) 294-7945

*Counsel for Appellant*

22

## CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

this document contains 5,299 words.

2.     This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman.

Respectfully submitted on this 1st day of November 2023.

Respectfully Submitted,

/s/ Glen K. Allen
Glen K. Allen
GLEN K. ALLEN LAW
5423 Springlake Way
Baltimore, MD  21212
(410) 802-6453

Frederick C. Kelly, III
LAW OFFICE OF FREDERICK C. KELLY
One Harriman Square
Goshen, NY 10924
(845) 294-7945

*Counsel for Appellant*